IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| | Civil No. 11-CV-2017 JWL/KGS |
| v. | |
| STEPHEN M. KOVZAN, | JURY TRIAL REQUESTED |
| Defendant. | |

**<u><span style="color:red">AMENDED</span> COMPLAINT</u>**

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

**SUMMARY**

1.      This case involves fraud and other misconduct by defendant Stephen M. Kovzan, the current Chief Financial Officer ("CFO") and former Chief Accounting Officer ("CAO") of NIC Inc. ("NIC" or the "Company"), a publicly-traded Kansas technology services company. Kovzan, as CAO and a member of NIC's disclosure committee, prepared, reviewed, and signed public filings NIC made with the Commission from 2002 to 2006 that concealed the payment of more than $1.18 million in perquisites to Jeffrey Fraser, NIC's then-Chief Executive Officer ("CEO") and Chairman of NIC's Board of Directors. Kovzan knew, or was reckless in not knowing, that NIC's proxy statements, annual reports, and registration statements filed with the Commission were materially false and misleading because they failed to disclose perquisites Fraser received from NIC from 2002 through 2005 and falsely represented that Fraser worked for little to no compensation. Kovzan also knew, or was reckless in not knowing, that NIC's filings

with the Commission materially understated the perquisites Fraser received from the company in 2006.

2.      Beginning in at least 2002, Kovzan received documents and other information that indicated that NIC was paying for Fraser's personal expenses.  Kovzan was repeatedly informed of problems with Fraser's requests for expense reimbursement, such as Fraser's failure to submit receipts or documentation supporting his reimbursement requests, but Kovzan failed to address the problems.  Even though Kovzan knew Fraser was not submitting receipts or documentation supporting a business purpose for his expenses as required by NIC policy, Kovzan instructed his staff in NIC's finance department to pay Fraser's expenses.  As a result of Kovzan's actions, NIC paid for more than one million dollars of Fraser's personal expenses, providing Fraser with significant undisclosed compensation in the form of perquisites.

3.      Fraser's undisclosed perquisites included payments for two homes; hunting expenses; vacations for Fraser, his girlfriend and his family; flight training; clothing; spa treatments; personal computers and electronics; health club memberships; a luxury car; and costs for Fraser to commute by private aircraft from his home in Wyoming to his office at NIC's Kansas headquarters.

4.      Kovzan had responsibility for implementing NIC's internal controls and policies and for ensuring that NIC's books, records, and accounts accurately reflected its transactions and disposition of assets.  Beginning in at least 2002, Kovzan knew, or was reckless in not knowing, that Fraser's expenses were falsely characterized as business expenses in NIC's books and records, when those expenses should have been recorded and disclosed as compensation.  Kovzan also circumvented NIC's internal controls and policies by authorizing NIC's payment of Fraser's personal expenses that lacked documentation of a business purpose.  Kovzan's failure to

2

exercise control over NIC's assets, report Fraser's misconduct to NIC's Audit Committee, and

disclose Fraser's compensation in NIC's public filings violated NIC's internal controls and

policies.  Kovzan also made false representations to NIC's independent auditors and failed to

inform the independent auditors of Fraser's expense reporting failures.

5. Kovzan personally profited from the wrongdoing alleged in this

~~Complaint~~Amended Complaint by, among other things, selling his shares of NIC stock while

NIC's public filings contained materially false and misleading statements and omissions.

6. Defendant Kovzan, as a result of the conduct described in this

~~Complaint~~Amended Complaint, has engaged in, and unless restrained and enjoined by this

Court, will in the future engage in transactions, acts, practices, and courses of business that

violate the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act")

[15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]; the internal

controls and books and records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. §

78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; and the misrepresentations

to auditors provision of Exchange Act Rule 13b2-2 [17 C.F.R. §§ 240.13b2-2]; and that aid and

abet violations of the reporting and proxy provisions of Sections 13(a) and 14(a) of the Exchange

Act [15 U.S.C. §§ 78m(a) and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 14a-3, and 14a-9

[17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.14a-3, and 240.14a-9] and the books and records and

internal controls provisions of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15

U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

7. The Commission brings this action pursuant to the authority conferred upon it by

Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d) and (e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] for an order permanently restraining and enjoining Kovzan from future violations of the above provisions; prohibiting Kovzan from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; requiring him to disgorge ill-gotten gains derived as a result of his violations and prejudgment interest thereon; imposing civil money penalties against Kovzan; and granting other equitable relief.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.    In connection with the transactions, acts, practices, and courses of business described in this ~~Complaint~~Amended Complaint, defendant Kovzan, directly or indirectly, used the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange.

13.    Venue is proper pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa] because certain of the acts, practices, and courses of business alleged in this Amended Complaint occurred in this District and the defendant resides in this District.

## DEFENDANT

14.    **Stephen M. Kovzan**, age 42, resides in Leawood, Kansas.  Kovzan was NIC's Controller from October 1999 until September 2000, when he became Vice President of Financial Operations and CAO.  In August 2007, Kovzan was promoted to become NIC's CFO.

4

During the relevant period, NIC's Assistant Controller reported directly to Kovzan, as NIC did not have a Controller.  Kovzan was licensed to practice as a CPA in Missouri starting in or about 1994, and in Kansas starting in or about 1996, but these licenses have lapsed.  Kovzan's accounting certificate status in Kansas is currently active.  From approximately 1994 until 1999, Kovzan worked at PricewaterhouseCoopers LLP and audited the books and records of NIC before the Company went public in 1999.

## RELATED INDIVIDUAL AND ENTITY

15.     **Jeffery S. Fraser**, age 51, a resident of Teton Village, Wyoming, is one of NIC's founders.  He was CEO of NIC and its predecessor, Kansas Information Consortium, Inc., from January 1992 to November 1999.  He later served as NIC's CEO from May 2002 until February 2008.  Fraser was Chairman of NIC's Board of Directors ("Board") from the company's formation until May 2008, and a Board member until September 2009.

16.     **NIC Inc.**, a Delaware corporation based in Olathe, Kansas, develops and manages web sites, online services, and secure payment processing systems for state, local, and federal government agencies.  At all relevant times, NIC's common stock was registered under Section 12 of the Exchange Act.  NIC's common stock is listed on the Nasdaq Global Select Market under the symbol "EGOV."

## FACTS

### Background

17.     From at least 2002 through 2007, NIC, a public company, was required to file certain documents with the Commission including annual reports on Forms 10-K, proxy statements and registration statements.  NIC incorporated by reference certain information regarding executive compensation from its proxy statements into its Forms 10-K for the years

2002 through 2006.  NIC incorporated its proxy statements, and annual reports into its registration statements filed during the period from 2002 through 2007.

18.     As NIC's CAO and a member of NIC's disclosure committee, Kovzan played a significant role in preparing and reviewing the annual reports, proxy statements and registration statements NIC filed with the Commission.  Kovzan reviewed and provided input into NIC's proxy statements covering the years 2002 through 2006.  He was responsible for preparing the executive compensation disclosures in NIC's proxy statements.  Kovzan also signed, reviewed and helped to prepare NIC's 2002 through 2006 annual reports, which incorporated NIC's proxy statements.  Kovzan reviewed and signed NIC's registration statements on Form S-8/A filed with the Commission on May 10, 2004; Form S-3 filed with the Commission on October 14, 2005; Form S-8 filed with the Commission on July 25, 2006; and two Forms S-8 filed with the Commission on November 20, 2006, which incorporated NIC's annual reports and proxy statements.  Additionally, Kovzan was the key NIC contact with NIC's independent auditors and signed NIC's management representation letters to its independent auditors from at least 2002 through 2007.

19.     In addition to participating in the preparation and review of NIC's public filings with the Commission, Kovzan was also responsible for managing, among other things, NIC's finance department, internal controls, taxes, budgeting and forecasting.

20.     Public companies, such as NIC, are required to furnish information required by Item 402 of Regulation S-K on Form 10K in their annual reports and proxy statements.  Among other things, Item 402 requires disclosure of the compensation, including perquisites, of the company's principal executive officer.  For the time period when Fraser served as NIC's CEO, NIC was required to report Fraser's total compensation, including perquisites, in its Forms 10-K

and proxy statements.  Kovzan was aware of SEC rules requiring disclosure of perquisites for the CEO in proxy statements and annual reports.

21.     From at least 2002 through 2006, Fraser received undisclosed compensation totaling more than $1.18 million in perquisites.  These undisclosed perquisites to Fraser included, among other things: (i) over $4,000 per month to live in a ski lodge in Wyoming; (ii) monthly cash payments to Fraser for purported rent for a Kansas house owned by an entity Fraser set up and controlled; (iii) vacations for Fraser, his girlfriend and his family; (iv) Fraser's flight training, hunting, spa, skiing, and health club expenses; (v) computers and electronics for Fraser and his family; (vi) a leased Lexus SUV; (vii) costs for Fraser to commute by private aircraft from his home in Wyoming to his office at NIC's Kansas headquarters; and (viii) other daily living expenses such as groceries, liquor, tobacco, nutritional supplements, and clothing.

22.     NIC's policies required, among other things, that all NIC employees submit proper documentation of business purpose for expenses over $10.  NIC's Code of Business Conduct and Ethics ("Code of Ethics"), which was posted on NIC's web site and referenced in NIC's proxy statement, required NIC officers and employees to use corporate credit cards solely for business purposes and to keep accurate records of funds spent.  From at least 2002 until 2007, Fraser violated NIC's policies and Code of Ethics by using his corporate credit card for personal expenses and by failing to submit proper documentation for expenses exceeding $10.  Kovzan also violated the Code of Ethics when he failed to abide by its provisions that he, as CAO, among other things, ensure full disclosure in filings with the Commission and achieve responsible use of and control over NIC's assets.

7

**Kovzan's Role in Fraser's Undisclosed Perquisites**

23.     Throughout the relevant time period, Kovzan authorized and directed NIC to pay Fraser's expenses, which included more than one million dollars of personal expenses.

24.     Beginning in at least mid-2002~~3~~, Kovzan received documents and other information showing that NIC was paying for Fraser's personal expenses.  For example, Kovzan received analyses of Fraser's credit card charges prepared by NIC's Assistant Controller; Fraser's proposed budgets; and monthly consolidated income statements for the executive department that included personal expenses for Fraser, such as reimbursements for housing, moving expenses, a gun vault, toys, ski lift tickets, gym memberships, vitamin supplements, and other perquisites.  In addition, in 2005, Kovzan learned: (i) that NIC's Compensation Committee approved leasing a luxury car for Fraser, and (ii) that NIC was making direct payments to vendors for utilities at a home in Kansas where Fraser stayed.

25.     Kovzan knew, or was reckless in not knowing, that each month NIC paid Fraser's credit card charges in full before receiving Fraser's monthly expense voucher and supporting documentation.  Sometime after NIC paid his credit card charges, Fraser would submit his monthly expense voucher without any receipts or other documentation of business purpose.  On his monthly expense vouchers, Fraser routinely failed to identify many of his personal credit card charges.  Of the credit card charges Fraser identified as personal, he repaid some, but avoided reimbursing NIC for others by offsetting them against purported "out-of-pocket" expenses.  Fraser claimed he paid these alleged "out-of-pocket" expenses in cash, but provided no documentation to NIC to prove that that the expenses had indeed been incurred or that they were business related.

Formatted: Font: Bold, Font color: Black

8

25.26.  By at least mid-2002, NIC's Assistant Controller notified Kovzan that there was no documentation supporting a business purpose for Fraser's expenses but Kovzan directed the Assistant Controller to pay the expenses without documentation.  In December 2007, when NIC hired outside counsel to conduct an internal review of Fraser's expenses, Kovzan admitted that there was a decision not to "bust Fraser's chops" because Fraser only was being paid one dollar and he was the founder of the company.

26.27.  From at least 2003, NIC's Assistant Controller alerted Kovzan that he was suspicious of Fraser's expense reimbursement requests because Fraser often claimed round amounts for his undocumented "out-of-pocket" expenses.  Even after learning of the Assistant Controller's suspicions, Kovzan circumvented NIC's policies and internal controls by authorizing and directing the Assistant Controller to pay Fraser's purported "out-of-pocket" expenses.  During the relevant time period, Fraser received NIC checks bearing Kovzan's signature for reimbursement of the purported "out of pocket" expenses.

27.28.  On several occasions, NIC's Assistant Controller also notified Kovzan about problems with, and concerns about, Fraser's corporate credit card charges.  For example, in August 2003 and September 2003, Kovzan received analyses of Fraser's credit card charges prepared by the Assistant Controller that included Fraser's personal expenses.  On or about October 2, 2003, the Assistant Controller sent Kovzan an email containing a list and analysis of Fraser's expenses, which showed that Fraser's undocumented credit card charges for the first eight months of 2003 totaled over $140,000.  The Assistant Controller highlighted the expenses that Fraser had not repaid, including a number of personal expenses.  The Assistant Controller warned Kovzan that "[a] number of these credit card and other expenses would completely flame employees, our customers, the board, and investors if they were aware.  Hopefully, none of this

9

is selected for audit and I won't have to explain the business purpose for these items."  The
Assistant Controller suggested NIC "eliminate the personal credit card expenses" and instead
give Fraser "pay for performance."  Kovzan knew these steps were not taken.

28.29.  On or about June 28, 2005, Kovzan received an email from NIC's Assistant
Controller attaching a spreadsheet of Fraser's April 2005 and May 2005 credit card expenses on
which the Assistant Controller indicated he had questions about the business purpose for a
number of these expenses, including tanning salon expenses, wilderness vacation expenses, and
clothing purchases.

29.30.  On or about November 9, 2005, Kovzan received an email from NIC's Assistant
Controller with the subject line "Credit Card receipt enforcement."  The Assistant Controller
warned Kovzan that one of the "key points to be aware of," was that Fraser does not include any
receipts with his signed credit card statements.  The Assistant Controller expressed concern that
"this could get us in trouble down the road by not having this support for the expenditures."

30.31.  On or about June 2, 2004, Kovzan discussed in emails with NIC's then-CFO the
need to improve internal controls over Fraser's expense reporting in order to comply with
internal controls requirements of Section 404 of the Sarbanes-Oxley Act of 2002.  NIC's then-
CFO expressed concerns to Kovzan after reviewing some of Fraser's expense vouchers.  In
Kovzan's response email, he noted that NIC's policies required: (i) receipts for all cash
expenditures in excess of $10.00 and for expenses related to air travel, hotel, car rental, meals,
entertainment, tolls, parking, and cab fares; and (ii) documentation for each expense describing
such things as the business purpose, who was present, and the place.

31.32.  Despite the documents and information he received from NIC's Assistant
Controller, and his knowledge of NIC's policies concerning expense reimbursements, Kovzan

10

repeatedly circumvented NIC's policies and internal controls by authorizing and directing NIC's finance department to pay Fraser's credit card expenses.  Kovzan knew, or was reckless in not knowing, that Fraser was using NIC's corporate credit cards for personal expenses, and that Fraser failed to provide receipts or other documentation supporting a business purpose for his credit card expenses.

32.33.   In addition to paying for Fraser's personal credit card charges and living expenses, Kovzan also knew, or was reckless in not knowing, that from at least 2002 through 2006, NIC paid Fraser for his commuting expenses to travel between his Wyoming home and Kansas office.  Kovzan knew that:  (i) Fraser resided in Wyoming and had a dedicated office at NIC's headquarters in Kansas; (ii) there was no business reason for Fraser to reside in Wyoming; and (iii) the personal benefits Fraser received -- private plane and other expenses to travel from his home to his office -- were not generally available to other NIC employees.

33.34.   In January 2004, NIC's Assistant Controller warned Kovzan that for tax purposes, there was a risk that Fraser's private plane travel from his Wyoming home to his Kansas office at NIC's headquarters could be deemed to be a commuting cost, which would be a personal expense and therefore compensation to Fraser.  The Assistant Controller explained that he did not have sufficient information to determine Fraser's main place of work and they would need to perform an analysis of Fraser's business activity for one year.  Kovzan, however, did not require this analysis be performed, and it never was done.  Accordingly, Kovzan had no reasonable basis to treat Fraser's commuting cost as a business expense instead of compensation.

34.35.   NIC's Board or its committees approved many of Fraser's travel and other expenses based on information that Kovzan and others in the finance department compiled.

11

35.36.  In March 2005, in connection with preparing the compensation disclosures for the 2004 proxy statement, NIC's Audit Committee Chairman, who also served as NIC's Compensation Committee Chairman (the "Committee Chairman"), expressed to Kovzan that Fraser's expenses for traveling between Wyoming and Kansas may not be deductible business expenses and may need to be disclosed as compensation to Fraser.  The Committee Chairman told Kovzan that he would defer to Kovzan on the issue as long as the required documents were being maintained.  Kovzan failed to inform the Committee Chairman that no analysis had been performed to support NIC's treatment of these travel expenses as business expenses and NIC was not retaining sufficient documentation.  Kovzan failed to disclose Fraser's commuting costs as a perquisite in any of NIC's proxy statements.

36.37.  Kovzan was repeatedly informed of actual and potential problems with Fraser's expenses, but Kovzan failed to tell NIC's Audit Committee or its independent auditors about any of the problems.  Although Kovzan had the authority to direct his staff to stop paying Fraser's expenses without proper documentation, he failed to do so.  Instead, Kovzan continued to authorize NIC's payment of Fraser's undocumented expenses, including personal expenses.  Kovzan also failed to disclose Fraser's personal expenses as perquisites in NIC's filings with the Commission.

**Kovzan's Misconduct Continued After the Commission**
**Proposed New Executive Compensation Rules in 2006**

37.38.  After the Commission proposed new executive compensation rules in early 2006, NIC's Assistant Controller warned NIC's then-Chief Operating Officer in an April 18, 2006 email about the risk of possible income tax fraud charges against Fraser and NIC because Fraser had not submitted any documentation of business purpose for his corporate credit card charges.

Shortly thereafter, Kovzan discussed in emails with NIC's then-CFO the possibility that someone might become a whistleblower.

38.39.  On about April 30, 2006, NIC's then-CFO sought comments from Kovzan on an email he was drafting to NIC's then-Chief Operating Officer regarding the magnitude and severity of Fraser's expense reporting failures.  Among other things, the draft email noted that:

> a.   Fraser had not submitted any receipts or indicated the business purpose of any of his credit card charges for 2005 and the first quarter of 2006 and there were over 1,200 charges in that time period which would require a receipt under NIC policies;
>
> b.   Fraser charged over $26,000 at three different home/furniture stores and there were "NUMEROUS other examples" of suspicious expenses;
>
> c.   Fraser usually charged a flat dollar amount each month for "out-of-pocket" expenses without any receipts or explanation;
>
> d.   a portion of Fraser's aircraft-related expenses were personal;
>
> e.   NIC paid personal expenses for Fraser: (i) without approval of NIC's compensation and/or Audit Committees; (ii) without taking into account the tax consequences to Fraser or NIC; and (iii) without NIC reporting these expenses as perquisites;
>
> f.   NIC had not disclosed any of Fraser's perquisites in NIC's 2005 proxy statement;
>
> g.   There was a risk of Commission enforcement action based on NIC's deficient internal controls over perquisites, noting that in 2005, the Commission brought an enforcement action against Tyson Foods "because

13

their system of internal controls did not report all of the perks to the Comp

Committee";

h.    employees "feel that [Fraser] appears to be ripping off the company and is

not required to follow the same rules that everyone else (including the

execs) has to follow";

i.    this was not "a going forward only matter - the 2005 expenses need[ed] to

be dealt with"; and

j.    NIC's Board and Compensation Committee would be making decisions

without "full disclosure" from management, "particularly in view of the

obligations [the CFO has] with the SEC and under [NIC's] CEO/Senior

Financial Officer Code of Ethics."

40.    In mid-2006, NIC adopted additional procedures regarding executive expense

reporting, but those procedures were not sufficient to fully remedy the problems with Fraser's

perquisites, and Fraser continued receiving undisclosed perquisites.

41.    For example, on about August 4, 2006, NIC's Compensation Committee directed

that to the extent Fraser's 2006 expenses lacked documentation of business purpose and/or failed

to comply with NIC's expense reimbursement policy, the expenses would be treated as

compensation to Fraser.  Contrary to that directive, Kovzan and others allowed Fraser to create

documentation of a business purpose after the fact for some of his 2006 expenses and reimburse

NIC for certain other 2006 expenses.

42.    Fraser did reimburse NIC a total of $110,000 for certain 2006 personal expenses

he had charged to NIC as business expenses, but failed to reimburse NIC for a number of other

2006 personal expenses.  Kovzan, who was the primary contact with NIC's independent auditors,

did not inform them that Fraser made this $110,000 repayment or of any improprieties with Fraser's expense reporting.  The independent auditors were not informed of any issues with Fraser's expense reporting until after NIC learned in mid-2007 of the Commission staff's investigation of facts surrounding Fraser's receipt of undisclosed perquisites.

43.    Additionally, during NIC's review of Fraser's 2006 expenses, Kovzan and other high-level executives decided it was not worth the effort to have Fraser review and repay any expenses from previous periods even though they discussed that Fraser had not been submitting documentation of business purpose for his expenses since 2002 and the amounts of Fraser's improper personal expenses likely were comparable each year.  Kovzan ignored NIC's Assistant Controller suggestion in an August 18, 2006 email to Kovzan that if they could not obtain receipts for Fraser's earlier expenses, they should estimate Fraser's personal expenses by applying the percentage of Fraser's 2006 expenses that were personal to Fraser's 2004 and 2005 expenses and that these amounts should be considered compensation to Fraser.

44.   On about September 26, 2006, NIC's then-CFO forwarded an email to Kovzan in which NIC's Assistant Controller voiced strong concerns about ignoring the past problems with Fraser's expense reporting:  "[Fraser] spent a crap load over the last three years and the company has little to show for it.  Now we're spinning it or sticking [our] heads in the sand about the history. . . [A]s a management team it appears that we're going to whitewash the historical issue."

45.    Kovzan ignored NIC's Assistant Controller's warning, did not address the pre-2006 problems with Fraser's expenses, and failed to inform NIC's independent auditors of Fraser's expense reporting failures.

15

46.     Disclosing Fraser's misconduct publicly could have adversely impacted NIC's business because some of NIC's business contracts provided that the customers could terminate the contracts for fraud or illegal conduct by NIC, its officers, or its directors.

47.     Kovzan also failed to remedy Fraser's expense reporting problems after 2006. Fraser continued to receive more than $100,000 of undisclosed perquisites in 2007, such as custom clothing, personal electronics, spa services for him and his girlfriend, and gym memberships.  Kovzan failed to maintain proper internal controls over Fraser's expense reporting and failed to ensure that these perquisites were properly recorded as compensation to Fraser in the Company's books, records and accounts.

**Kovzan Concealed Fraser's Perquisites and NIC Executives' Violations of NIC's Code of
Ethics in NIC's Filings with the Commission for the Years 2002 through 2006**

48.     Based on the facts alleged herein, Kovzan knew, or was reckless in not knowing, that NIC's annual reports on Forms 10-K for 2002 through 2006 that Kovzan signed and reviewed, the related proxy statements that Kovzan reviewed and helped to draft, and the relevant registration statements that Kovzan signed and reviewed, were materially false and misleading because these filings:  (i) failed to disclose any of Fraser's perquisites from 2002 to 2005; (ii) falsely represented that Fraser received only nominal compensation from 2002 to 2005; and (iii) materially understated Fraser's perquisites in 2006.

49.     The amount of Fraser's compensation that NIC disclosed in its public filings with the Commission from 2002 through 2006, and the amount of Fraser's undisclosed perquisites, are summarized below:

| Year | Disclosed | Disclosed | Disclosed | Undisclosed perquisites |
|------|-----------|-----------|-----------|-------------------------|

|  | **Salary** | **Bonus** | **perquisites** |  |
|---|---|---|---|---|
| 2002 | $1 | -- | -- | More than $90,000 |
| 2003 | $1 | -- | -- | More than $300,000 |
| 2004 | $5,500 | -- | -- | More than $300,000 |
| 2005 | $5,500 | -- | -- | More than $400,000 |
| 2006 | $218,500 | $110,000 | $272,681 | More than $60,000 |

50.   Kovzan also knew, or was reckless in not knowing, that NIC's proxy statements for 2003 through 2006  were false and misleading because NIC referred to its Code of Ethics as a means to promote shareholder confidence in NIC and its management, but failed to disclose that Kovzan and other NIC executives were violating that Code of Ethics.  Among other things, NIC's proxy statements failed to disclose:

  a.   That Kovzan did not:  (i) achieve responsible use of and control over all assets and resources within his purview; (ii) ensure full, fair, and accurate disclosure in NIC's Commission filings; (iii) establish and maintain disclosure controls and procedures to ensure that material information was included in all public documents; (iv) inform NIC's independent auditors of material misstatements and omissions regarding Fraser's compensation in NIC's proxy statements and annual reports; and (v) report Fraser's violations of the Code of Ethics to the Audit Committee;

  b.    That Fraser was violating NIC's Code of Ethics by using corporate credit cards for personal expenses, failing to document the business purpose for his expenses, and failing to keep accurate records of funds spent; and

17

c.      That NIC's then-CFO failed to ensure Fraser's perquisites were disclosed in Commission filings, failed to achieve responsible use and control of NIC's assets within his purview and failed to maintain controls over Fraser's expenses.

**Kovzan Provided Substantial Assistance to NIC in Its Reporting, Proxy, Internal Control and Books and Records Violations**

51.     Kovzan provided substantial assistance to NIC in its reporting and proxy violations by helping to draft, review and/or sign NIC's annual reports and proxy statements. Kovzan knew, or was reckless in not knowing, that NIC's annual reports and proxy statements for the years 2002 through 2006 were materially false and misleading, in part because they failed to disclose Fraser's perquisites.

52.     Kovzan also knew, or was reckless in not knowing, that Fraser's personal expenses were falsely characterized as business expenses in NIC's books and records, including NIC's general ledger and the internal financial statements for NIC's executive department, when those expenses should have been recorded, characterized, classified and disclosed as executive compensation.

53.     Kovzan had responsibility for NIC's accounting controls and the recording and classification of expenses in NIC's books and records.  Kovzan provided substantial assistance to NIC in its internal controls and books and records violations by: (i) failing to accurately report Fraser's compensation, (ii) failing to enforce NIC's policies by instructing his accounting staff to process Fraser's undocumented expense requests, (iii) allowing Fraser to use the corporate credit card for personal charges, and (iv) failing to inform NIC's Audit Committee and its independent auditors about these problems.

**Kovzan Made False Representations to NIC's Independent Auditors**

18

54.     Kovzan made numerous false representations to NIC's independent auditors.  For example, Kovzan signed management representation letters to NIC's independent auditors in connection with their annual audits of NIC's financial statements for 2002 to 2006.  These letters were dated on or about March 20, 2003; March 8, 2004; March 3, 2005; March 14, 2006; and March 13, 2007.

55.     Among other things, Kovzan misrepresented in the March 20, 2003 and March 8, 2004 management representation letters that:

      a.    There were no significant deficiencies in the design or operation of internal controls that could adversely affect NIC's ability to record, process, summarize and report financial data, when Kovzan knew about the internal controls deficiencies over Fraser's expense reporting and that Fraser's expenses were falsely characterized as business expenses in NIC's books and records; and

      b.    Kovzan had no knowledge of any fraud or suspected fraud affecting NIC management, when Kovzan knew, or was reckless in not knowing, of his and Fraser's fraudulent conduct.

56.     Among other things, Kovzan misrepresented in the March 3, 2005; March 14, 2006; and March 13, 2007 management representation letters that:

      a.    Kovzan had concluded that NIC maintained effective internal control over financial reporting as of the end of the preceding calendar year, when Kovzan knew about the internal controls deficiencies over Fraser's expense reporting;

19

      b.      Kovzan had disclosed to NIC's independent auditors all deficiencies in the design or operation of internal controls over financial reporting (whether or not remediated) as part of his assessment of the effectiveness of internal controls over financial reporting as of the end of the preceding calendar year, when Kovzan had not disclosed any deficiencies with respect to Fraser's expense reporting and NIC's reporting of Fraser's compensation in its filings with the Commission; and

      c.      Except for a matter at one of NIC's subsidiaries in 2004, Kovzan had no knowledge of any fraud or suspected fraud affecting NIC involving senior management, when Kovzan had knowledge of his own and Fraser's fraudulent conduct.

57.      In the March 13, 2007 management representation letter, Kovzan also misrepresented that he had no knowledge of any allegations of fraud or suspected fraud affecting NIC received in communications from employees, even though Kovzan had received an email from NIC's then-CFO, dated April 30, 2006, stating that Fraser "appears to be ripping off the Company."

58.      Kovzan also signed a November 20, 2006, management representation letter to NIC's auditors issued in connection with the registration statements filed on that day, falsely stating that no information had come to his attention that would cause him to believe the representations he made in the March 14, 2006 management representation letter regarding NIC's internal controls over financial reporting as of December 31, 2005, should be modified.  In fact, after signing the March 14, 2006 management representation letter, Kovzan received an email from NIC's then-CFO, dated May 1, 2006, in which the then-CFO detailed the magnitude

and severity of Fraser's expense reporting failures in 2005.  When Kovzan signed the November 20, 2006 management representation letter, he knew that Fraser had repaid NIC approximately $110,000 for personal expenses that he had charged to NIC in 2006 as business expenses. Kovzan also discussed with other executives that the amount of personal expenses Fraser had received in prior years was likely comparable.

**NIC's Stock Price Dropped After NIC's First Disclosure of Fraser's Expense Issues**

66.     On February 6, 2008, NIC announced Fraser's retirement and disclosed for the first time that there had been issues concerning Fraser's expense reporting.  In a Form 8-K, NIC disclosed that Fraser had reimbursed NIC $283,000 for expenses that were not consistent with the Company's expense reimbursement policy.  However, the Form 8-K was misleading because it purported to disclose the results of an internal review of Fraser's expenses, but failed to disclose that the review concluded that Fraser had intentionally misclassified his expenses.

67.     In the three days of trading after this limited disclosure, NIC's stock price dropped a total of approximately 16%.

**Kovzan Personally Benefited from His Misconduct**

68.     Kovzan personally profited from the misconduct described in this ~~Complaint~~Amended Complaint by, among other things, selling more than 110,000 shares of NIC stock from at least November 2003 through May 2008 obtaining profits of approximately $300,000, while NIC's materially false and misleading public filings were in the marketplace.  In addition, some of Kovzan's shares were the subject of  NIC's false and misleading registration statements that he reviewed and signed.  Kovzan also benefitted from his misconduct by receiving a promotion to become NIC's CFO in August 2007.

**The Commission's Action is Timely**

21

69.     The Commission proceeded with due diligence during the limitations period, and did not receive inquiry notice of the fraud and other misconduct alleged herein until June 7, 2007, when an informant reported to the Commission's Enforcement staff that NIC's CEO had received certain personal benefits that the company covered up.

70.     After receiving this inquiry notice, the Commission exercised due diligence in investigating Kovzan's misconduct.  The Commission had to, among other things, obtain documents and witness accounts from numerous persons and entities, ascertain the nature of the thousands of personal payments to the CEO disguised as legitimate business expenses over a several year period, and review hundreds of thousands of documents involved.  In addition, NIC's books and records are inaccurate, incomplete and do not identify the universe of Fraser's expenses.  Accordingly, the Commission did not discover, and in the exercise of due diligence, could not have discovered, the facts underlying the Defendant's fraud alleged herein until several years after its receipt of inquiry notice.

68.

**CLAIM ONE**
**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

69.71.  Paragraphs 1 through 68 are hereby restated and incorporated herein by reference.

70.72.  Defendant Kovzan, by engaging in the conduct alleged above, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of NIC securities, with scienter:  (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(iii) engaged in acts, transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon other persons.

71.73.  By engaging in the conduct alleged above, Kovzan violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### CLAIM TWO
### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

72.74.  Paragraphs 1 through 71 are hereby restated and incorporated herein by reference.

73.75.  Defendant Kovzan, by engaging in the conduct alleged above, directly or indirectly, in the offer or sale of NIC's securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

74.76.  By engaging in the conduct alleged above, Kovzan violated Section 17(a)(1) of the Securities Act [15 U.S.C. §§ 77q(a)(1)].

### CLAIM THREE
### Violations of Sections 17(a)(2) and (3) of the Securities Act
### [15 U.S.C. § 77q(a)(2)(3)]

75.77.  Paragraphs 1 through 74 are hereby restated and incorporated by reference.

76.78.  Defendant Kovzan, by engaging in the conduct described above, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of NIC securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:  (i) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in transactions,

23

practices or courses of business that operated or would operate as a fraud or deceit upon purchasers of NIC securities.

77.79.  By engaging in the conduct alleged above, defendant Kovzan violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

### CLAIM FOUR
**Aiding and Abetting Violations of Section 13(a)
and Rules 12b-20 and 13a-1 of the Exchange Act
[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20 and 240.13a-1]**

78.80.  Paragraphs 1 through 77 are hereby restated and incorporated herein by reference.

79.81.  Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rule 13a-1 [17 C.F.R. § 240.13a-1] require all issuers with securities registered under Section 12 of the Exchange Act to file complete and factually accurate annual reports with the Commission on Form 10-K.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-12] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

80.82.  As alleged above, NIC filed with the Commission false and misleading annual reports on Forms 10-K.  In so doing, NIC violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

81.83.  By engaging in the conduct alleged above, Kovzan knowingly or recklessly provided substantial assistance to NIC in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

82.84.  By engaging in the conduct alleged above, Kovzan aided and abetted NIC's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

**CLAIM FIVE**
**Aiding and Abetting Violations of Sections 13(b)(2)(A)**
**and 13(b)(2)(B) of the Exchange Act**
**[15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

83.85.  Paragraphs 1 through 82 are hereby restated and incorporated herein by reference.

84.86.  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.  Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP")  and to maintain the accountability of assets.

85.87.  By engaging in the conduct alleged above, NIC violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

86.88.  By engaging in the conduct alleged above, Kovzan knowingly or recklessly provided substantial assistance to NIC in its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

87.89.  By engaging in the conduct alleged above, Kovzan aided and abetted NIC's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

**CLAIM SIX**

25

**Violations of Rule 13b2-2 of the Exchange Act**
**[17 C.F.R. § 240.13b2-2]**

~~88.~~90.   Paragraphs 1 through 87 are hereby restated and incorporated herein by reference.

~~89.~~91.   Defendant Kovzan, by engaging in the conduct alleged above, directly or

indirectly:  (i) made, or caused to be made, materially false or misleading statements; or (ii)

omitted to state, or caused others to omit to state, material facts necessary in order to make

statements made, in light of the circumstances under which they were made, not misleading, to

an accountant in connection with an audit, review, or examination of financial statements or the

preparation or filing of a document or report required to be filed with the Commission.

~~90.~~92.   By engaging in the conduct alleged above, Kovzan violated Rule 13b2-2 of the

Exchange Act [17 C.F.R. § 240.13b2-2].

**CLAIM SEVEN**
**Violations of Section 13(b)(5) of the Exchange Act**
**[15 U.S.C. § 78m(b)(5) ]**

~~91.~~93.   Paragraphs 1 through 90 are hereby restated and incorporated herein by reference.

~~92.~~94.   Defendant Kovzan, by engaging in the conduct alleged above, knowingly

circumvented or knowingly failed to implement a system of internal accounting controls or

knowingly falsified books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange

Act [15 U.S.C. § 78m(b)(2)(A)].

~~93.~~95.   By engaging in the conduct alleged above, Kovzan violated Section 13(b)(5) of

the Exchange Act [15 U.S.C. § 78m(b)(5)].

**CLAIM EIGHT**
**Violation of Exchange Act Rule 13b2-1**
**[17 C.F.R. § 240.13b2-1]**

94.   Paragraphs 1 through 93 are hereby restated and incorporated by reference.

95.    Defendant Kovzan, by engaging in the conduct alleged above, directly or indirectly, falsified or caused to be falsified books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

~~94.~~96.  By engaging in the conduct alleged above, defendant Kovzan violated Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1

### CLAIM NINE
**Aiding and Abetting Violations of Section 14(a) and
Rules 14a-3 and 14a-9 of the Exchange Act
[15 U.S.C. § 78n(a) and 17 C.F.R. §§ 240.14a-3 and 240.14a-9]**

~~95.~~97.  Paragraphs 1 through 94 are hereby restated and incorporated herein by reference.

~~96.~~98.  Section 14(a) of the Exchange Act requires registrants that solicit any proxy or consent or authorization in connection with any security registered pursuant to Section 12 of the Exchange Act (other than an exempted security), to comply with such rules as the Commission may promulgate.  Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement containing the information specified in Schedule 14A, which requires, among other things, information about executive compensation.  Exchange Act Rule 14a-9 prohibits, among other things, the use of proxy statements that omit to state any material fact necessary in order to make the statements therein not false or misleading.

~~97.~~99.  By engaging in the conduct alleged above, NIC violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

~~98.~~100. By engaging in the conduct alleged above, defendant Kovzan knowingly or recklessly provided substantial assistance to NIC in its violations of Section 14(a) of the

Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

99. 101. By engaging in the conduct alleged above, Kovzan aided and abetted NIC's violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

A.    Permanently enjoin defendant Kovzan from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2]; and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 14a-3, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.14a-3, and 240.14a-9].

B.    Order defendant Kovzan to disgorge, with prejudgment interest, all ill-gotten gains received by virtue of the conduct alleged herein.

C.    Order defendant Kovzan to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], in an amount to be determined by the Court, plus post-judgment interest.

D.    Prohibit defendant Kovzan, pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

E.     Grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

F.     Grant such other relief as the Court may deem just and appropriate.

Dated:          ~~January 12~~ April 8, 2011

Respectfully submitted,


 s/ David Frohlich
David Frohlich (Kansas Bar No. 13977)
~~Erica Y.~~ A. David Williams (Pro hac vice ~~application~~
~~pending~~)
(~~Virginia~~ California Bar No. 183854 ~~43303; District of Columbia Bar     No. 464518~~)
Jeffrey Tao (D. C. Bar No. 477398)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-5546
Phone: 202-551-4963
Fax: 202-772-9228
E-mail: frohlichd@sec.gov


Of Counsel:

ANTONIA CHION
New York Bar Attorney Registration No. 1873405
LISA WEINSTEIN DEITCH
California Bar No. 137492
HOLLY A. PAL
District of Columbia Bar No. 490737
HELAINE SCHWARTZ
New York Bar Attorney Registration No. 1917046