# Exhibit B

10-3581-cv (L)
SEC v. Gabelli

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

-------------

August Term 2010

(Argued: June 2, 2011          Decided: August 1, 2011)

Docket Nos. 10-3581-cv(L), 10-3628-cv(XAP), 10-3760-cv (XAP)

- - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellant/Cross-Appellee,

- against -

MARC J. GABELLI and BRUCE ALPERT,

Defendants-Appellees/Cross-Appellants.

- - - - - - - - - - - - - - - - - - - - - X

Before:    LIVINGSTON and CHIN, Circuit Judges, and
           RAKOFF, District Judge.*

     Appeal from a final order and judgment of the United States
District Court for the Southern District of New York granting in
part defendants' motions to dismiss.   REVERSED.

                     DOMINICK V. FREDA (Jacob H. Stillman, Hope
                     Hall Augustini, on the brief), Securities and
                     Exchange Commission, Washington, D.C., for
                     Plaintiff-Appellant.

                     LEWIS J. LIMAN (Kimberly C. Spiering,
                     Katherine L. Wilson-Milne, David R. Lurie, on
                     the brief), Cleary Gottlieb Steen & Hamilton
                     LLP, New York, New York, for
                     Defendant-Appellee Gabelli.

_____
     *The Honorable Jed S. Rakoff, United States District Judge
for the Southern District of New York, sitting by designation.

-1-

| | |
|---|---|
| 1 | KATHLEEN N. MASSEY (Edward A. McDonald, |
| 2 | Joshua I. Sherman, on the brief), Dechert |
| 3 | LLP, New York, New York, for Defendant- |
| 4 | Appellee Alpert. |

5  RAKOFF, District Judge.

6  Plaintiff-appellant the Securities and Exchange Commission

7  ("SEC") appeals from a judgment entered August 17, 2010,

8  dismissing the SEC's complaint against Marc J. Gabelli, the

9  portfolio manager of the mutual fund Gabelli Global Growth Fund

10  ("GGGF" or the "Fund"), and Bruce Alpert, the chief operating

11  officer for the Fund's adviser, Gabelli Funds, LLC ("Gabelli

12  Funds" or the "Adviser").  For the following reasons, we REVERSE

13  the District Court's judgment and REMAND for further proceedings

14  consistent with this opinion.[1]

15                           **BACKGROUND**

16  Unless otherwise noted, the following facts are taken from

17  the complaint and are presumed to be true.  In essence, the SEC's

18  complaint charges defendants with failing to disclose favorable

19  treatment accorded one GGGF investor in preference to other

20  investors: specifically, the fact that Gabelli Funds, investor

21  adviser to GGGF, while prohibiting most GGGF investors from

22  engaging in a form of short-term trading called "market timing,"

23  secretly permitted one investor to market time the Fund in

24  exchange for an investment in a hedge fund managed by Gabelli.

---

[1] Defendants Gabelli and Alpert have each filed
cross-appeals, but for the reasons stated herein we do not reach
the cross-appeals.

-2-

1  Compl. ¶¶ 1, 20-21, 17, 31, 35-38, 42, 44-45.

2  <u>A. Market Timing</u>

3  "Market timing" refers, <u>inter alia</u>, to buying and selling

4  mutual fund shares in a manner designed to exploit short-term

5  pricing inefficiencies. <u>See</u> Exemptive Rule Amendments of 2004:

6  The Independent Chair Condition (Apr. 2005) ("Staff Report"),

7  <u>available at</u> http://www.sec.gov/news/studies/indchair.pdf. A

8  mutual fund sells and redeems its shares based on the fund's net

9  asset value ("NAV") for that day, which is usually calculated at

10  the close of the U.S. markets at 4:00 P.M. Eastern Time. Prior

11  to 4:00 P.M., market timers either buy or redeem a fund's shares

12  if they believe that the fund's last NAV is "stale," <u>i.e.</u>, that

13  it lags behind the current value of a fund's portfolio of

14  securities as priced earlier in the day. The market timers can

15  then reverse the transaction at the start of the next day and

16  make a quick profit with relatively little risk.

17  Mutual funds like GGGF that invest in overseas securities

18  are especially vulnerable to a kind of market timing known as

19  "time zone arbitrage," whereby market timers take advantage of

20  the fact that the foreign markets on which such funds' portfolios

21  of securities trade have already closed (thereby setting the

22  closing prices for the underlying securities) before the close of

23  U.S. markets.[2] Market timers profit from purchasing or redeeming

_____

[2] An illustration of time zone arbitrage is provided in the
SEC's complaint:

-3-

1   fund shares based on events occurring after foreign market

2   closing prices are established, but before the events have been

3   reflected in the fund's NAV.   In order to turn a quick profit,

4   market timers then reverse their positions by either redeeming or

5   purchasing the fund's shares the next day when the events are

6   reflected in the NAV.

7        Although market timing is not itself illegal, market timing

8   can harm long-term investors in the fund by "rais[ing]

9   transaction costs for a fund, disrupt[ing] the fund's stated

10   portfolio management strategy, requir[ing] a fund to maintain an

11   elevated cash position [to satisfy redemption requests], ...

12   result[ing] in lost opportunity costs and forced liquidations ...

13   unwanted taxable capital gains for fund shareholders and [a

14   reduction of] the fund's long term performance."   Id. at 32-33.

15   See also Janus Capital Grp. Inc. v. First Derivative Traders, --

---

For example, a U.S. mutual fund may hold shares of a
Japanese company traded on the Tokyo Stock Exchange
("TSE").   Because of the time-zone difference, the TSE
may close at 2:00 a.m. EST.   If the U.S. mutual fund
uses the TSE closing price for the Japanese company's
stock to calculate the mutual fund's NAV at 4:00 p.m.
EST, that fund's NAV will be based, at least partially,
on market information that is fourteen hours old.
Positive market movements during the New York trading
day, which will later cause the Japanese market to rise
when it opens at 8 p.m. EST, will not be incorporated
into the fund's NAV, thereby cause the NAV to be
artificially low.   On such a day, a trader who buys the
U.S. fund at the artificially low or "stale" price can
realize a profit the next day by selling the U.S.
fund's shares.

See Compl. ¶ 17.

1   U.S. --, 131 S. Ct. 2296, 2300 (2011) ("Although market timing is

2   legal, it harms other investors in the mutual fund.").

3   B. The Parties

4        Gabelli Funds, an investment adviser within the meaning of

5   Section 2(a)(20) of the Investment Company Act of 1940 and

6   Section 202(a)(11) of the Investment Advisers Act of 1940 (the

7   "Advisers Act"), is the investment adviser to GGGF, an open end

8   investment company, or mutual fund, registered under the

9   Investment Company Act.  Compl. ¶¶ 12-13.  Marc Gabelli was the

10  portfolio manager for GGGF and its predecessor fund from 1997 to

11  2004 and also managed several Gabelli-affiliated hedge funds.

12  Id. ¶ 10.  From 1988 to 2003, Bruce Alpert was Gabelli Funds'

13  chief operating officer and the person who directed the Adviser's

14  "market timing police," a group of GGGF employees that monitored

15  trading in the Adviser's mutual funds in order to restrict market

16  timing.  Id. ¶¶ 1, 11, 31.  Najy N. Nasser was the chief

17  investment adviser to Folkes Asset Management, now called

18  Headstart Advisers Ltd. ("Headstart").  Id. ¶¶ 1, 10.

19  C. The Alleged Misconduct

20       The complaint alleges that from 1999 until 2002, Gabelli and

21  Alpert permitted Headstart to engage in time zone arbitrage

22  (which defendants referred to as "scalping") that took advantage

23  of stale pricing opportunities in GGGF.  Id. ¶¶ 17, 36, 42.

24  Initially the amount of such scalping was limited, but on April

25  7, 2000, Gabelli allegedly agreed to permit Headstart to increase

1    its market timing capacity from $7 million to $20 million, in

2    exchange for a $1 million investment by Headstart in a hedge fund

3    that Gabelli managed.  Id. ¶ 21.  Headstart's $1 million

4    investment, which constituted approximately four percent of

5    Gabelli's hedge fund's assets, was made the day after Headstart's

6    increase in market timing.  Id. ¶ 23.

7         Between April 2000 and the Spring of 2002, Headstart's

8    increased market timing in GGGF's shares regularly involved

9    between four and fifteen percent of GGGF's assets.  Id. ¶ 24.

10   Eventually, however, following instructions from the Fund's

11   parent company, Gabelli and Alpert caused Headstart to reduce its

12   ownership in GGGF and, in August 2002, to cease its market timing

13   activity, whereupon Headstart redeemed its remaining investment

14   in Gabelli's hedge fund.  Id. ¶¶ 25-28.

15        Prior to the cessation, however, and during the same period

16   that Gabelli and Alpert were approving Headstart's market timing

17   in GGGF shares, Alpert and Gabelli banned at least 48 other GGGF

18   accounts from market timing and rejected market timing purchases

19   totaling at least $23 million.  Id. ¶ 35.  As early as December

20   2000, Alpert drafted an internal memorandum that explained that

21   since "Market Timers (scalpers) have been using the International

22   and Global Funds in a way that is disruptive to the Fund and the

23   management of the portfolio," the Adviser was making efforts to

24   "identify each account and restrict them for purchasing the

25   funds."  Id. ¶ 31.  For the next two years, "market timing

-6-

1   police" -- employees instructed by Alpert to monitor market

2   timing activity within Gabelli Funds -- reviewed purchases in

3   global funds: if it appeared that the purchase was a market

4   timing trade, the purchase was rejected and sometimes the account

5   was banned from making future purchases.  Id.  Yet, during the

6   very same period, Alpert instructed the market timing police to

7   ignore Headstart's market timing activity because "it was a Marc

8   Gabelli client relationship," and assured Nasser that Headstart's

9   accounts would not be blocked.  Id. ¶¶ 33, 35.

10  According to the complaint, Headstart's market timing

11  unfairly favored Headstart over all other GGGF investors.  Thus,

12  while Headstart's three accounts that market timed GGGF shares

13  during the relevant period earned rates of return of 185 percent,

14  160 percent, and 73 percent, respectively, the rate of return for

15  all other GGGF shareholders over the same period was, at best,

16  negative 24.1 percent.  Id. ¶¶ 2, 39.  Headstart's market timing

17  also caused annual dilution ranging from one to four percent of

18  GGGF's assets.  Id.

19  While Headstart was market timing GGGF, the defendants

20  allegedly did not disclose to GGGF's Board of Directors or to the

21  other GGGF shareholders that Headstart was market timing, that it

22  was being given an advantage accorded no other shareholder, and

23  that there was a conflict of interest created by the agreement

24  with Headstart.  As a result, the Board was allegedly misled into

25  believing that the Adviser was taking all necessary steps to

-7-

1    reduce or ban market timing activity in general.  Id. ¶¶ 36-38.

2    For example, on February 21, 2001, Alpert and Gabelli attended a

3    GGGF Board meeting where they each addressed the Board.  Alpert

4    told the Board about the dangers of market timing and the efforts

5    that Gabelli Funds was undertaking to eliminate this practice,

6    but failed to disclose that Headstart was being permitted to

7    market time GGGF.  Immediately after Alpert's report, Gabelli

8    reported on operations of GGGF, but also failed to disclose

9    Headstart's market timing.  After the meeting, Alpert and Gabelli

10   continued to allow Headstart to engage in market timing trades.

11   Id.

12        According to the complaint, even after the market timing

13   ceased, the defendants continued to mislead the Board and GGGF

14   investors.  In particular, on September 3, 2003 -- the same day

15   that the New York Attorney General announced he was investigating

16   market timing in mutual funds -- Alpert, in an alleged effort to

17   reassure GGGF investors, posted a memorandum (the "Memorandum")

18   on the website of Gabelli Funds' parent company.  Id. ¶¶ 43-44.

19   The Memorandum stated that:

20        [F]or more than two years, scalpers have been identified and
21        restricted or banned from making further trades.  Purchases
22        from accounts with a history of frequent trades were
23        rejected.  Since August 2002, large transactions in the
24        global, international and gold funds have been rejected
25        without regard to the past history.  While these procedures
26        were in place they did not completely eliminate all timers.

27   Id. ¶ 44.  In light of what Gabelli and Alpert knew and, indeed,

28   had authorized in market timing by Headstart, this Memorandum,

-8-

1    the complaint alleges, was materially misleading.  Id. ¶ 45.

2        Finally, the complaint alleges that because of the secret

3    nature of the defendants' wrongdoing, as well as the defendants'

4    affirmative misrepresentations to GGGF's Board and shareholders,

5    the SEC did not discover the fraud until late 2003.  Id. ¶¶ 46-

6    47.

7        On April 24, 2008, the SEC filed its complaint against the

8    defendants, alleging in its First Claim that Alpert had violated

9    the antifraud provisions of Section 10(b) of the Securities

10   Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5

11   promulgated thereunder, 17 C.F.R. § 240.10b-5, in its Second

12   Claim that Alpert had violated the antifraud provisions of

13   Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a),

14   and in its Third Claim that both Alpert and Gabelli had aided and

15   abetted violations by the Adviser of the antifraud provisions of

16   Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-

17   6(1) & (2).  As relief for these violations, the SEC sought

18   injunctions against future violations, disgorgement of ill-gotten

19   gains, and civil monetary penalties.

20       On July 25, 2008, each of the defendants moved to dismiss

21   the complaint under Federal Rule of Civil Procedure 12(b)(6) for

22   failure to state a claim upon which relief may be granted.  On

23   March 17, 2010, the District Court granted the defendants'

24   motions in substantial part.  First, the District Court dismissed

25   the Securities Act and Securities Exchange Act claims against

-9-

1    Alpert, finding that Alpert's statement in the Memorandum that

2    "for more than two years, scalpers have been identified and

3    restricted or banned from making further trades" was "literally

4    true" and that because "this statement was not a

5    misrepresentation ... Alpert had no duty to disclose fully

6    Headstart's market-timing." <u>SEC v. Gabelli</u>, No. 08 Civ. 3868

7    (DAB), 2010 WL 1253603, at *8 (S.D.N.Y. Mar. 17, 2010).  Second,

8    while the District Court denied defendants' motion to dismiss the

9    Advisers Act claim, it ruled that the SEC could not seek civil

10   penalties for that claim because: (a) the SEC did not bring the

11   claim within the statute of limitations period applicable to such

12   penalties, and (b) the SEC is not authorized to seek monetary

13   penalties for aiding and abetting violations of the Advisers Act.

14   <u>Id.</u> at *4-5, 11-12.  Third, the District Court dismissed the

15   SEC's prayer for injunctive relief because the SEC "has not

16   plausibly alleged that Defendants are reasonable likely to engage

17   in future violations." <u>Id.</u> at *11.  Thus, the SEC's Advisers Act

18   claim against the defendants survived the motions to dismiss, but

19   the District Court barred all relief other than disgorgement.

20       Believing that disgorgement would not provide significant

21   relief, the SEC moved to voluntarily dismiss the remaining claim

22   without prejudice to the SEC's refiling this claim if, but only

23   if, the SEC were successful in this appeal.  The District Court

24   granted the motion over the defendants' objections and entered

25   judgment accordingly.

1        The SEC now appeals the District Court's dismissal of its

2   Securities Act and Securities Exchange Act claims against Alpert

3   and the District Court's rejection of the SEC's prayers for civil

4   penalties and injunctive relief for the defendants' aiding and

5   abetting violations of the Advisers Act.  In addition to opposing

6   the SEC's appeal, both defendants have cross-appealed, contending

7   that the District Court erred in denying their motions to dismiss

8   the SEC's prayer for disgorgement under the Advisers Act and,

9   more generally, in denying their motions to dismiss with

10  prejudice the SEC's claim for aiding and abetting violations of

11  the Advisers Act.

12                              **DISCUSSION**

13  <u>A. Appellate Jurisdiction</u>

14        We first address whether we have jurisdiction to hear the

15  instant appeals.  We generally lack jurisdiction over an "appeal

16  from a dismissal of some of plaintiff's claims when the balance

17  of the claims have been dismissed without prejudice pursuant to a

18  Rule 41(a) dismissal of the action," because permitting such an

19  appeal would allow the parties to "effectively ... secure[] an

20  otherwise unavailable interlocutory appeal."  <u>Chappelle v. Beacon</u>

21  <u>Commc'ns Corp.</u>, 84 F.3d 652, 654 (2d Cir. 1996).  However, in

22  <u>Purdy v. Zeldes</u>, 337 F.3d 253, 258 (2d Cir. 2003), we recognized

23  an exception to this rule where "a plaintiff's ability to

24  reassert a claim is made conditional on obtaining a reversal from

-11-

1    this court." Id.   Under these circumstances, a judgment may be

2    deemed "final," because the plaintiff "runs the risk that if his

3    appeal is unsuccessful, his ... case comes to an end."   Id.

4        Given Purdy, it is clear that we have jurisdiction to

5    consider the SEC's appeal, since the only dismissal that was

6    without prejudice was expressly conditioned on the SEC's promise

7    not to reassert this claim unless its appeal of this dismissal

8    was successful on appeal.   However, given the strong policy

9    against interlocutory appeals, we see no reason to extend the

10   narrow exception announced in Purdy to the defendants' cross-

11   appeals.   Nor do we think we should exercise pendent appellate

12   jurisdiction over the cross-appeals.   The doctrine of pendent

13   appellate jurisdiction -- which "allows us, where we have

14   jurisdiction over an interlocutory appeal of one ruling, to

15   exercise jurisdiction over other, otherwise unappealable

16   interlocutory decisions," see Myers v. Hertz Corp., 624 F.3d 537,

17   552 (2d Cir. 2010) (internal quotation marks omitted) -- "should

18   be exercised sparingly, if ever," Bolmer v. Oliveira, 594 F.3d

19   134, 141 (2d Cir. 2010) (internal quotation marks omitted).

20   Assuming the doctrine applies here at all, we see here none of

21   the "exceptional circumstances," Papineau v. Parmley, 465 F.3d

22   46, 65 (2d Cir. 2006) (internal quotation marks omitted), that

23   would warrant its invocation at this juncture.   We therefore

24   limit ourselves to the SEC's appeal.

25   B. Standard of Review

-12-

1    Turning to the merits of that appeal, we review the District

2    Court's grant of the motions to dismiss de novo, "accept[ing] all

3    well-pleaded allegations in the complaint as true [and] drawing

4    all reasonable inferences in the plaintiff's favor."  Operating

5    Local 649 Annual Trust Fund v. Smith Barney Fund Mgmt. LLC, 595

6    F.3d 86, 91 (2d Cir. 2010).  To survive a motion to dismiss,

7    however, a complaint must "allege a plausible set of facts

8    sufficient 'to raise a right to relief above the speculative

9    level.'"  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

10   555 (2007)).

11   C. The Securities Act and Securities Exchange Act Claims against

12   Alpert

13   Applying these standards, we first consider whether the

14   District Court erred in dismissing the Securities Act and

15   Securities Exchange Act claims against Alpert that were premised

16   on the theory that his statements in the Memorandum of 2003 were

17   materially misleading.  That Memorandum, as noted, stated that

18   "for more than two years, scalpers have been identified and

19   restricted or banned from making further trades" but that the

20   Adviser "did not completely eliminate all timers."  The District

21   Court was apparently of the view that because such statements

22   were "literally true," they could not be misleading.  See

23   Gabelli, 2010 WL 1253603, at *8.

24   The law is well settled, however, that so-called "half-

25   truths" -- literally true statements that create a materially

-13-

1    misleading impression -- will support claims for securities

2    fraud.  See List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d

3    Cir. 1965); see also Rule 10b-5, 17 C.F.R. § 240.10b-5.  Here,

4    the complaint plausibly alleges that a reasonable investor

5    reading the Memorandum would conclude that the Adviser had

6    attempted in good faith to reduce or eliminate GGGF market timing

7    across the board, whereas, as Alpert well knew but failed to

8    disclose, the Adviser had expressly agreed to let one major

9    investor, Headstart, engage in a very large amount of GGGF market

10   timing, in return for Headstart's investment in a separate hedge

11   fund run by Gabelli.  The District Court therefore erred in

12   dismissing the Securities Act and Securities Exchange Act claims.

13       Alpert further argues, however, that even if the statements

14   in the Memorandum were misleading, the District Court's

15   determination can be affirmed on either of two alternate grounds:

16   a failure to adequately allege materiality or a failure to

17   adequately allege intent.

18       As to materiality, "a complaint may not properly be

19   dismissed ... on the ground that the alleged misstatements or

20   omissions are not material unless they are so obviously

21   unimportant to a reasonable investor that reasonable minds could

22   not differ on the question of their importance." Ganino v.

23   Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (internal

24   quotation marks omitted).  Here, the complaint alleges that,

25   pursuant to an undisclosed agreement between the defendants and

-14-

1    Headstart, the latter was permitted to engage in market time

2    trading up to $20 million per transaction and completed 836 such

3    transactions over a three year period.  In total, Headstart

4    allegedly traded $4.2 billion in GGGF, approximately 62 percent

5    of the total value of all trading in the Fund during that period,

6    and earned $9.7 million in profits while other GGGF investors,

7    who were not only themselves precluded from such trading but also

8    unaware of its being undertaken by Headstart, suffered annual

9    losses of at least 24.1%.  Compl. ¶¶ 21, 40.

10       Although the negative economic impact of these massive

11   trades on GGGF's assets was less severe, see Compl. ¶ 2, it was

12   still sufficient to create a jury issue as to its materiality.

13   And, in any event, the notion that a reasonable investor would

14   regard as immaterial the failure to disclose the secret

15   arrangement by which the Fund and its Adviser, in return for a

16   pay-off to another fund, allowed one GGGF investor to engage in

17   highly profitable market timing while denying this opportunity to

18   all other investors, borders on the frivolous.

19       As to intent, the complaint alleges that Alpert knew, or was

20   reckless in not knowing, that the statements in the Memorandum

21   were misleading, because, inter alia, Alpert -- the author of the

22   Memorandum that reasonably gave the impression that the Adviser

23   was making best efforts to eliminate scalping -- had himself

24   given the order to the market timing "police" to let Headstart

25   continue its massive market timing, and because, as he also knew,

-15-

1   Headstart was being given the preference in return for a secret

2   pay-off in the form of an investment in Gabelli's hedge fund.

3   Also, contrary to Alpert's contention that the complaint fails to

4   allege that he knew market timing was harmful to the Fund, the

5   complaint alleges that Alpert redeemed his own holdings in GGGF

6   because, as he told a fellow Gabelli Funds officer, "Marc Gabelli

7   was allowing the GGGF to be scalped."  Compl. ¶ 42.  Accordingly,

8   we find that the complaint adequately states claims against

9   Alpert for violations of Section 17(a) of the Securities Act and

10  Section 10(b) of the Securities Exchange Act.

11  D. Civil Penalties

12       We next turn to whether the District Court erred in

13  dismissing the prayer for civil penalties under the Advisers Act

14  on the alternative grounds that (a) the SEC is not permitted to

15  seek civil penalties in connection with a claim for aiding and

16  abetting violations of the Advisers Act, and (b) the claim for

17  civil penalties is time-barred.  The first ground is plainly

18  wrong, for this Court has previously held that civil penalties

19  may be assessed in connection with such a claim.  See SEC v.

20  DiBella, 587 F.3d 553, 571-72 (2d Cir. 2009) (holding that

21  because a "'violation' of the Advisers Act" includes the aiding

22  and abetting of principal violations of the Advisers Act, "the

23  civil penalty provision encompasses both primary and secondary

24  violators of the Advisers Act").

25       As for the alternative ground, the relevant statute of

-16-

1    limitations is set forth in 28 U.S.C. § 2462, which provides that

2    a claim for civil penalties must be brought within five years

3    "from the date when the claim first accrued."  28 U.S.C. § 2462

4    (emphasis supplied).  Because the complaint charges violations of

5    the antifraud provisions of the Advisers Act,[3] the SEC argues

6    that the claim did not "accrue" until September 2003 when, as the

7    complaint alleges, the SEC first discovered the fraud.  This, the

8    SEC argues, is because the determination of accrual under § 2462

9    is subject to the fraud-based discovery rule -- "a doctrine that

10   delays accrual of a cause of action until the plaintiff has

11   'discovered' it," or in the exercise of due diligence, should

12   have discovered it, see Merck & Co. v. Reynolds, -- U.S. --,  130

13   S. Ct. 1784, 1793-94 (2010).  The defendants respond that since

14   no reference to the discovery rule appears in the plain language

15   of 28 U.S.C. § 2462, the SEC's claim for civil penalties accrued

16   in August 2002, the last instance of Headstart's market timing in

17   GGGF.  In addition, defendant Gabelli argues that the discovery

18   rule cannot save the SEC's claims against him because he did not

19   take affirmative steps to conceal his misconduct.

20       As an initial matter, we note that Gabelli's latter argument

21   reflects the all-too-common mistake by which the discovery rule

22   is "sometimes confused with the concept of fraudulent concealment

_____

[3] Specifically, the Third Claim alleges violations of Section
206(1) of the Advisers Act, which prohibits "any device, scheme,
or artifice to defraud," and Section 206(2), which prohibits any
practice that "operates as a fraud or deceit."

-17-

1    of a cause of action," see Pearl v. City of Long Beach, 296 F.3d

2    76, 80 (2d Cir. 2002), and we take this opportunity to once again

3    clarify that these two doctrines are distinct.  Under the

4    discovery rule, the statute of limitations for a particular claim

5    does not accrue until that claim is discovered, or could have

6    been discovered with reasonable diligence, by the plaintiff.  As

7    a general matter, this rule does not govern the accrual of most

8    claims because most claims do not involve conduct that is

9    inherently self-concealing.  However, since fraud claims by their

10    very nature involve self-concealing conduct, it has been long

11    established that the discovery rule applies where, as here, a

12    claim sounds in fraud.  As the Supreme Court recently stated in

13    Merck, "[t]his Court long ago recognized that something different

14    was needed in the case of fraud, where a defendant's deceptive

15    conduct may prevent a plaintiff from even knowing that he or she

16    has been defrauded."  130 S. Ct. at 1793 (emphasis in original).

17    See also TRW Inc. v. Andrews, 534 U.S. 19, 37 (2001) (Scalia, J.,

18    concurring) (the discovery rule is a "historical exception for

19    suits based on fraud").  Thus, contrary to Gabelli's contention,

20    the discovery rule applies to fraud claims "though there be no

21    special circumstances or efforts on the part of the party

22    committing the fraud to conceal it from the knowledge of the

23    other party."  Bailey v. Glover, 88 U.S. (21 Wall.) 342, 348

24    (1874).  See also John P. Dawson, *Fraudulent Concealment and*

1   *Statues of Limitation*, 31 M<small>ICH</small>. L. R<small>EV</small>. 875, 880 (May 1933)

2   ("Where undiscovered 'fraud' was the basis of liability, it was

3   universally agreed that no new concealment was necessary.").

4       The fraudulent concealment doctrine, by contrast, is an

5   equitable tolling doctrine, not an accrual doctrine.  Under the

6   fraudulent concealment doctrine, even when a claim has already

7   accrued, a plaintiff may benefit from equitable tolling in the

8   event that the defendant took specific steps to conceal her

9   activities from the plaintiff.  Thus, whereas the discovery rule

10  does not ordinarily apply to non-fraud claims (as it is generally

11  expected that a plaintiff will be able to discover the conduct

12  underlying non-fraud claims), the fraudulent concealment doctrine

13  may be used to toll the limitations period for non-fraud claims

14  where the plaintiff is able to establish that the defendant took

15  affirmative steps beyond the allegedly wrongful activity itself

16  to conceal her activity from the plaintiff.

17      In this case, since the Advisers Act claim is made under the

18  antifraud provisions of that Act and alleges that the defendants

19  aided and abetted Gabelli Funds' fraudulent scheme, we hold that

20  the discovery rule defines when the claim accrues and,

21  correlatively, that the SEC need not plead that the defendants

22  took affirmative steps to conceal their fraud.  Although the

23  defendants make much of the fact that Section 2462 does not

24  expressly state a discovery rule, this Court has previously held

-19-

1   that for claims that sound in fraud a discovery rule is read into

2   the relevant statute of limitation.  See Dabney v. Levy, 191 F.2d

3   201, 205 (2d Cir. 1951) (Hand, J.) ("[I]n cases of 'fraud' ...

4   when Congress does not choose expressly to say the contrary, the

5   period of limitation set by it only begins to run after the

6   injured party has discovered, or has failed in reasonable

7   diligence to discover, the wrong.") (internal quotations

8   omitted).  Indeed, the Supreme Court has recently affirmed that a

9   fraud claim "accrues" only when the plaintiff discovers the

10  fraud.  Merck, 130 S. Ct. at 1793-94.  Thus, while Congress might

11  have to affirmatively include language about a discovery rule in

12  the event that it wanted a discovery rule to govern the accrual

13  of non-fraud claims or wanted to impose a limit on using a

14  discovery rule for certain fraud claims, it would be unnecessary

15  for Congress to expressly mention the discovery rule in the

16  context of fraud claims, given the presumption that the discovery

17  rule applies to these claims unless Congress directs otherwise.[4]

18  See Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946) (the

19  discovery rule for claims of fraud "is read into every federal

20  statute of limitation.") (emphasis added).

_____

[4] The defendants' reliance on 3M Co. v. Browner, 17 F.3d
1453 (D.C. Cir. 1994), is misplaced, since it did not involve
fraud claims but concerned violations of the Toxic Substances
Control Act.  Id. at 1460-63.  As the Seventh Circuit recently
observed in SEC v. Koenig, 557 F.3d 736, 739 (7th Cir. 2009),
"[w]e need not decide when a 'claim accrues' for the purpose of §
2462 generally, because the nineteenth century recognized a
special rule for fraud, a concealed wrong."

1    The defendants then argue that even if the discovery rule

2    applies, the SEC's prayer for civil penalties must still fail

3    because the SEC has not pled reasonable diligence.  Cf. SEC v.

4    Koenig, 557 F.3d 736, 739 (7th Cir. 2009) (pursuant to discovery

5    rule, "a victim of fraud has the full time from the date that the

6    wrong came to light, or would have done had diligence been

7    employed").  They claim that all of the evidence that GGGF was

8    being harmed by market timing was publicly disclosed in periodic

9    reports with the SEC and that, with reasonable diligence, the

10   SEC's claims could have been discovered within Section 2462's

11   five year limitations period.  But the entire argument is, at

12   best, premature.  The "lapse of a limitations period is an

13   affirmative defense that a defendant must plead and prove,"

14   Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 426 (2d

15   Cir. 2008), and dismissing claims on statute of limitations

16   grounds at the complaint stage "is appropriate only if a

17   complaint clearly shows the claim is out of time."  Harris v.

18   City of New York, 186 F.3d 243, 250 (2d Cir. 1999).  Here, since

19   the complaint expressly alleges that the SEC first discovered the

20   facts of defendants' fraudulent scheme in late 2003, therefore,

21   applying the discovery rule, the claim for civil penalties claims

22   is not clearly time-barred.[5]  Finding that at this stage in the

_____

[5] Indeed, the Seventh Circuit has observed that requiring
the SEC to plead why it did not discover a fraud sooner would be
"nonsensical" as it would require a plaintiff to "prove a
negative" in the complaint.  Marks v. CDW Computer Ctrs., Inc.,

1   litigation defendants have not met their burden of demonstrating

2   that a reasonably diligent plaintiff would have discovered this

3   fraud prior to September 2003, we conclude that the SEC's prayer

4   for civil penalties survives defendants' motions to dismiss and

5   must be reinstated.

6   E. Injunctive Relief

7        Finally, we turn to whether the District Court erred in

8   dismissing the SEC's prayer for injunctive relief.  In

9   determining whether injunctive relief is appropriate, "[t]he

10  critical question ... is whether there is a reasonable likelihood

11  that the wrong will be repeated."  SEC v. Manor Nursing Ctrs.,

12  Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).  We first observe that

13  where, as here, the complaint plausibly alleges that defendants

14  intentionally violated the federal securities laws, it is most

15  unusual to dismiss a prayer for injunctive relief at this

16  preliminary stage of the litigation, since determining the

17  likelihood of future violations is almost always a fact-specific

18  inquiry.[6]  Indeed, the defendants are unable to point to a single

19  case where the SEC's prayer for injunctions against further

---

122 F.3d 363, 368 n.2 (7th Cir. 1997) (internal quotation marks
omitted).

     [6] For present purposes, we simply assume without deciding
that a complaint must include sufficient factual allegations to
plausibly allege not only a "claim to relief," Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007) (construing Fed. R. Civ. P.
8(a)(2)), but also a "demand for the relief sought," Fed. R. Civ.
P. 8(a)(3)).

1   violations was dismissed at the motion to dismiss stage based

2   upon a finding of non-likelihood of further violations.  In any

3   event, since the complaint alleges that for almost three years

4   Gabelli and Alpert intentionally aided and abetted Advisers Act

5   violations and since "fraudulent past conduct gives rise to an

6   inference of a reasonable expectation of continued violations,"

7   see id., we conclude that the complaint sufficiently pleads a

8   reasonable likelihood of future violations and thus reverse the

9   District Court's dismissal of the SEC's prayer for injunctive

10  relief.

11  <u>CONCLUSION</u>

12      For the foregoing reasons, we grant the SEC's appeal in all

13  respects, dismiss the cross-appeals for want of appellate

14  jurisdiction, and remand to the District Court for proceedings

15  consistent with this opinion.