IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          v.<br><br>STEPHEN M. KOVZAN,<br><br>                    Defendant. | Civil No. 11-CV-2017 JWL/KGS |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT STEPHEN M. KOVZAN'S SECOND MOTION TO COMPEL**

Of Counsel:

Antonia Chion
(N.Y. Bar No. 1873405)
Lisa Weinstein Deitch
(California Bar No. 137492)
Holly A. Pal (D. C. Bar No. 490737)
Helaine Schwartz
(N.Y. Bar No. 1917046)
Securities And Exchange Commission

Jeffrey S. Kruske (Kansas Bar No. 20098)
Office of the Securities Commissioner
109 SW 9th Street, Suite 600
Topeka, KS 66612
Telephone: (785) 296-5215

A. David Williams (Cal. Bar 183854)
David S. Mendel (D.C. Bar 470796)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5546
E-mail: williamsdav@sec.gov
Phone: (202) 551-4548 (Williams)

Dated:  November 28, 2012                    *Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

BACKGROUND ...............................................................................................................1

ARGUMENT AND AUTHORITIES .............................................................................7

   1.  Kovzan Seeks Information Beyond the Proper Scope of
       Responses to Interrrogatories.............................................................................7

   2.  The Perquisite Information Supplied To Kovzan Was Adequate At This
       Stage of the Litigation.........................................................................................9

   3.  The Scienter Evidence Supplied to Kovzan Is Adequate ................................14

   4.  Kovzan Seeks Information Subject to Expert Discovery ................................17

CONCLUSION.................................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Allianz Ins. Co. v. Surface Specialties, Inc.*, No. 03-cv-2470 (DM/DJW),
   2005 WL 44534 (D. Kan. Jan. 7, 2005)........................................................7

*Apsley v. Boeing Co.*, No. 05-cv-1368 (MLB/KMH), 2007 WL 3120712
   (D. Kan. Oct. 24, 2007)...............................................................................19

*FTC v. Ivy Capital, Inc.*, No. 11-cv-283 (JCM/GWF), 2012 WL 1883507
   (D. Nev. May 22, 2012) ................................................................................8

*High Point SARL v. Spring Nextel Corp.*, No. 09-cv-2269 (CM/DJW),
   2011 WL 4526770 (D. Kan. Sept. 28, 2011) ..............................................19

*Hilt v. SFC Inc.*, 170 F.R.D. 182 (D. Kan. 1997) ...........................................7, 8

*IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316 (D. Kan. 1998)..........7

*Presbyterian Manors v. Simplexgrinnell, LP*, No. 09-2656 (KHV/KGS),
   2010 WL 3880027 (D. Kan. Sept. 28, 2010) ...............................................7

*SEC v. Berry*, No. 07-cv-4431 (RMW/HRL), 2011 WL 2441706
   (N. D. Cal. June 15, 2011) ..........................................................................11

*SEC v. Buntrock*, No. 02-cv-2180, 2004 WL 1470278 (N.D. Ill. June 29, 2004) .............18

*SEC v. Das*, No. 10-cv-102 (LSC), 2011 WL 4375787 (D. Neb. Sept. 20, 2011) ............15

*SEC v. Kalvex*, 425 F. Supp. 310 (S.D.N.Y. 1975)............................................9

*SEC v. Kovzan*, 807 F. Supp. 2d 1024 (D. Kan. 2011) .........................14, 15, 17

*Shoemake v. McCormick, Summars & Talarico*, No. 10-cv-2514 (RDR/KGS),
   2011 WL 5553652 (D. Kan. Nov. 15, 2011) ................................................7

*Stoldt v. Centurion Industries, Inc.*, No. 03-cv-2634 (CM/DJW), 2005 WL
   375667 (D. Kan. Feb. 3, 2005) ...................................................................18

*In re Urethane Antitrust Litig.*, No. 04-md-1616 (JWL/JPO), 2009 WL 2058759
   (D. Kan. July 15, 2009)................................................................................18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil No. 11-CV-2017 JWL/KGS** |
| **v.** | |
| **STEPHEN M. KOVZAN,** | |
| **Defendant.** | |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT STEPHEN M. KOVZAN'S
SECOND MOTION TO COMPEL**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") submits this Memorandum of Law in Opposition to Defendant Stephen M. Kovzan's Second Motion to Compel.

**BACKGROUND**

On January 12, 2011, the SEC brought this civil enforcement action against Stephen M. Kovzan ("Kovzan"), the chief financial officer and former chief accounting officer of NIC Inc. ("NIC" or the "Company"), a publicly-traded technology services company headquartered in Olathe, Kansas. The Commission's Amended Complaint alleges that, between at least 2002 and 2007, Kovzan participated in a fraudulent scheme to conceal from investors secret compensation paid to Jeffery Fraser, NIC's then-Chief Executive Officer and Chairman of its Board of Directors. Kovzan personally authorized and directed the Company's finance department to pay personal expenditures for Fraser's benefit. And after personally authorizing the payments,

Kovzan -- who was trained as a certified public accountant and familiar with SEC disclosure requirements – drafted financial disclosures and proxy statements for NIC in each year of the scheme that affirmatively concealed from NIC's shareholders the substantial benefits being bestowed on Fraser.  Because of his central role in the fraudulent scheme, the Commission alleges that Kovzan violated the anti-fraud, books and records, internal controls, proxy disclosure, and lying to auditors provisions of the federal securities laws, and aided and abetted NIC's violations of certain of these same provisions.

During discovery, the Magistrate Judge granted Kovzan's motion to compel the Commission's response to Kovzan's First Set of Interrogatories, which called for the identification of "each and every expense [the Commission] contend[s] constituted an undisclosed perquisite to Jeffrey S. Fraser," and further sought the identification of "all evidence supporting the inference that each expense constituted an undisclosed perquisite," as well as "all evidence supporting the inference that Mr. Kovzan knew or recklessly disregarded that the expense constituted an undisclosed perquisite."  July 31, 2012 Order, pp. 2-5 [Docket No. 89].

In response to the Order, the Commission served upon Kovzan its supplemental responses to the relevant interrogatories.  These responses disclosed to Kovzan approximately sixty pages of discrete expenses, identifying each and every one of the more than 2,000 individually identified credit card expenses, spanning from mid-2002 through late 2006, dozens of direct payments made by NIC on behalf of Fraser during the same time period, in addition to specific claimed out-of-pocket expenses which the Commission asserts were perquisites, in addition to the amounts of undisclosed private aircraft travel disclosed to Kovzan.

The responses further explain, in detail, why the identified perquisites are, in fact, perquisites.  The Commission explained:

Fraser has admitted that many of the corporate credit card charges, direct payments, out-of-pocket expenses, and private aircraft travel costs reflected as perquisites in SEC-P 00001 through SEC-P 00060, were in fact personal expenses. For example, Fraser marked certain expenses as personal (with a "P") when reviewing his monthly corporate credit card statements, and to the extent Fraser did not repay these expenses before they were required to be disclosed, they are included in SEC-P 00001 through SEC-P 00060. Additionally, many of the perquisites listed in SEC-P 00001 through SEC-P 00060 are personal expenses that were not disclosed as perquisites during the relevant filing periods, but that Fraser agreed to repay as a result of look backs conducted by NIC and the internal review conducted by NIC's Audit Committee (the "Internal Review"). When confronted in testimony about his expenses, Fraser conceded that certain categories of expenses included in SEC-P 00001 through SEC-P 00060 as undisclosed perquisites, were not related to NIC business. [7/30/09 Fraser Inv. Test.]

For other personal expenses Fraser charged to NIC, Fraser offers purported business justifications that are plainly absurd. For example, Fraser claims he charged NIC for travel expenses and meals for his girlfriend "because she helped him on business trips, particularly by making sure he had clean clothes." [1/14/08 memo of Spencer Fane interview with Fraser. NIC007494-07500]. Fraser considered his spa treatments to be business expenses because "if you get refreshed and you're feeling good, I think you can go do -- I think you can do business better." [7/30/09 Fraser Inv. Test. pp. 175-76] Fraser also had NIC pay for his dry cleaning bills in Wyoming (where he lived) because "he uses suits only for business and he travels all the time." [1/14/08 memo of Spencer Fane interview with Fraser. NIC007494-07500].

Fraser charged all of his expenses (personal and business alike) to his corporate credit card, as he did not have a personal credit card during the relevant time period. [7/30/09 Fraser Inv. Test. p. 99]. Many of the perquisites included in SEC-P 00001 through SEC-P 00060 are obviously personal expenses as indicated by the vendor and/or location. Additionally, for most of the expenses identified as perquisites in SEC-P 00001 through SEC-P 00060, there are no receipts or other documentation to support that the expenses were business-related, let alone that the expenses were directly and integrally related to NIC's business. [12/13/07 memo of Spencer Fane interview with Tammy Miller; 11/9/05 email from Reynolds to Kovzan, NIC117763-64; 7/12/07 memo of Spencer Fane interview with Reynolds and Kovzan. Reynolds 7/13/09 testimony transcript at pgs.78, 81.] For the perquisites identified on SEC-P0000059, there is no underlying documentation to suggest that the expenses were even incurred, as Fraser merely submitted round amounts (or amounts that were round after he offset them against what he admitted he owed to NIC) for purported out-of-pocket expenditures. [Reynolds 7/13/09 testimony transcript at pgs.110-12.] Fraser himself characterized the amounts he submitted for out-of-pocket expenses as "just a guess." [1/14/08 memo of Spencer Fane interview with Fraser. NIC007494-07500.]

Finally, the costs of Fraser's travel between Wyoming and Kansas constitute commuting expenses, which are required to be disclosed as perquisites. There was no business reason for Fraser to live in Wyoming – he chose to live there because it was his personal preference. [1/6/10 Kovzan testimony transcript at pg. 832.] NIC paid for the

Teton Village, Wyoming condominium in which Fraser lived,[NIC007494-500]. and the lease NIC entered into clearly stated that the property was to be used only for residential purposes. [NIC 170978-1003]. NIC's headquarters, where Fraser worked and had an office, was located in Kansas. [AB 001261-65].

The responses further explain, again in extended detail, why Kovzan knew or was

reckless in not knowing that the identified perquisites were, in fact, perquisites. The

Commission explained:

Kovzan admitted, when interviewed for the Internal Review, that he was "aware and concerned that Fraser provided no documentation for any of the expenses he incurred." [NIC007398-400] Despite the fact that beginning in at least 2002, NIC finance employees who worked under Kovzan informed him that there was no documentation to support the business purpose of Fraser's corporate credit card expenses [12/13/07 memo of Spencer Fane interview with Tammy Miller. 7/12/07 memo of Spencer Fane interview with Reynolds and Kovzan. Reynolds 7/13/09 testimony transcript at pgs. 81-82] nor the business purpose or existence of Fraser's purported out-of-pocket expenses, [Reynolds 7/13/09 testimony transcript at pgs. 110-112], Kovzan directed his subordinates to process Fraser's expenses without any supporting documentation. [Reynolds 7/13/09 testimony transcript at pgs. 82-83]. Kovzan conceded in testimony that he had the authorization to stop Fraser's expense vouchers from being processed but he did not do so. [1/6/10 Kovzan testimony transcript at pgs. 705-06].

Starting in 2002, NIC's finance department staff repeatedly raised concerns to Kovzan regarding Fraser's expenses and whether it was appropriate for NIC to pay such expenses for Fraser. [NIC007158-162]. After NIC's accounts payable specialist started processing Fraser's expense reimbursements in 2002, she reported to Kovzan that she tried to get receipts for Fraser's expenses from Fraser's assistant and was essentially told that she should not bother because Fraser founded NIC, and Kovzan responded that he would talk to Fraser. [NIC007338-341]. Similarly, beginning in 2002 or 2003, NIC's then Assistant Controller notified Kovzan that he suspected some of Fraser's corporate credit card charges were personal based on the vendors for the charges. [Reynolds 7/13/09 testimony transcript at pgs. 84-85]. As early as 2003, NIC's then Assistant Controller also began sending Kovzan analyses of Fraser's expenses that included detailed lists of Fraser's corporate credit card charges in addition to specifically warning Kovzan that "[a] number of [Fraser's] credit card and other expenses would completely [in]flame employees, our customers, the board, and investors if they were aware. Hopefully, none of this is selected for audit and I won't have to explain the business purpose for these items." [NIC174668-705;NIC174706-707]. When Kovzan was interviewed as part of the Internal Review, he explained that at the time he received this warning, it was reasonable to conclude that some of Fraser's corporate credit card charges were personal, but that "because Fraser was taking a $1 salary, 'how much do you bust his chops?'"[NIC007401-409].

4

Over the years, Kovzan continued to discuss concerns about Fraser's expenses with various individuals at NIC. Since 2003, NIC's former Assistant Controller reiterated to Kovzan on several occasions that Fraser's expenses lacked any supporting documentation of business purpose. [NIC006918 – 6920.] In response, Kovzan told NIC's then assistant controller that Fraser was not going to bother to turn in receipts. [Reynolds 7/13/09 testimony transcript at pgs. 82-83]. NIC's then Assistant Controller also raised a concern with Kovzan that Fraser's claimed out-of-pocket expenses were not real expenditures because Fraser was submitting such reimbursement claims in round numbers without any receipts. [*Id.* at pgs. 110-12]. In June 2004, NIC's then Chief Financial Officer, emailed Kovzan that he had started reviewing Fraser's monthly expense reports, but had to "'disclaim an opinion.'" [NIC106185-86]. In November 2005, NIC's then Assistant Controller emailed Kovzan that Fraser did not submit receipts for Fraser's corporate credit card expenses and Kovzan acknowledged that he knew the problem had been going on for years. [NIC117763-64]. In July 2005, Kovzan forwarded to NIC's then-Chief Operating Officer a list of Fraser's April 2005 and May 2005 credit card expenses identifying a number of expenses for which the business purpose was questionable. [NIC007193-199].

Kovzan admitted to the SEC that he had been aware of Fraser charging personal expenses to his corporate credit card. [6/30/09 Kovzan investigative test. at 219-220]. Kovzan reviewed, and in many instances signed off on, NIC's monthly corporate department financials, which listed expenses for Fraser that clearly appeared to be personal.[NIC101841-102098; NIC102206-2395; NIC115260-5315; NIC118085-8096; NIC176393-6408; NIC176412-16; SEC v Kovzan 0000742-44]. Kovzan also received Fraser's proposed annual budgets, which included up to $3,500/month for temporary housing and up to $4,500 for office lease for 2005 (when Fraser was living in Wyoming and working at NIC's headquarters in Kansas) [6/30/09 Kovzan investigative test. at 254-59]. When Kovzan was interviewed for the Internal Review, he was shown a spreadsheet of Fraser's 2004-2005 credit card charges and Kovzan conceded "that many of the charges on this spreadsheet look like expenses of Fraser's personal life." [NIC007401-409]. Kovzan stated that in 2004-2005, he recalled being aware of questionable charges to Bed Bath & Beyond on Fraser's corporate credit card. [*Id.*]

In addition to knowing that NIC had paid these personal expenses for Fraser, Kovzan was aware that these expenses were perquisites requiring disclosure. During the relevant time period, Kovzan was responsible for NIC's accounting and SEC reporting. [6/30/09 Kovzan test. at pgs. 21-22; NIC114105-111]. Kovzan testified that he was the primary individual to compile the executive compensation table for NIC's proxy statements. [7/1/09 Kovzan test. at pgs. 470-72]. In early 2006, Kovzan was aware of the Commission's newly proposed revisions to its executive compensation disclosure rules and in light of the focus on perquisites, Kovzan acknowledged that he was concerned about Fraser's expenses. [NIC007240-47]. In 2006, Kovzan expressed concerns about allowing Fraser to determine which of his expenses were personal and Kovzan actually identified the perquisites to be disclosed for Fraser for 2006. Kovzan stated that in March

5

2007, he reviewed all 2006 expenses in preparation for NIC's proxy statement disclosures. *Id*.

Kovzan understood that commuting costs were required to be disclosed as perquisites and that Fraser commuted from his home in Wyoming to his office in Kansas. NIC's Audit Committee Chairman specifically highlighted for Kovzan that Fraser's travel expenses between Wyoming and Kansas were commuting costs that should be disclosed in NIC's 2004 proxy statement as income to Fraser, given that Fraser's primary office was in Kansas.  [AB001261-65].  Additionally, Reynolds informed Kovzan that Fraser's business activity for one year needed to be analyzed in order to determine whether Fraser's travel expenses from Wyoming to Kansas could be considered a business expense rather than commuting, and Kovzan knew that such an analysis was never conducted.   [NIC102804-05].  Kovzan admitted to the SEC that there was no business purpose for Fraser to live in Wyoming – that it was Fraser's personal preference to live there.  [1/6/10 Kovzan test. at pg. 832.]. When interviewed in connection with the Internal Review, Kovzan acknowledged that NIC incurred substantial travel costs by allowing Fraser to live in Wyoming. [NIC 007246].

In October 2005, Kovzan attended a NIC board meeting at which the Board approved NIC paying for a leased Lexus (after Fraser had already signed the lease) for Fraser to use in Wyoming "as additional compensation" and directed "the Finance department to ascertain the actual amount of additional compensation" to Fraser. [NIC001434-36]. Kovzan was listed as the contact person on a letter from Lexus enclosing the car lease and a letter from Aon enclosing the automobile identification card for Fraser's leased Lexus was addressed to Kovzan.  [NIC 157013-022; NIC157083]. Kovzan told the SEC that he considered country club memberships and leased automobiles to be "classic" perquisites and that those are the types of items he considered when deciding what perks NIC should disclose.  [1/6/10 Kovzan test. at pg. 766]. Additionally, when interviewed in connection with the Internal Review, Kovzan provided the example of a company car in explaining what he understood constituted "'traditional perks.'" [NIC007240-47].

Notwithstanding the detailed identification of each and every perquisite at issue in this case, the description of and citation to the extensive evidentiary basis for the conclusion that the perquisites were perquisites, and the description of and citation to the vast factual record demonstrating Kovzan's knowledge and intent, Kovzan now undertakes additional burdensome, time-consuming motion practice to compel answers to questions that he already has.  Because Kovzan's present motion has no basis either in fact or in law, it should be denied.

## ARGUMENT AND AUTHORITIES

### 1.  Kovzan Seeks Information Beyond the Proper Scope of Responses to Interrogatories

As even Kovzan seems to recognize, in response to interrogatories a party is entitled to discover only the "principal and material facts" supporting the opposing party's claims. Kovzan's Memorandum in Support of Second Motion to Compel ("Mem") at 6.  *E.g., Presbyterian Manors v. Simplexgrinnell, LP*, No. 09-2656 (KHV/KGS), 2010 WL 3880027, at *14, n. 97 (D. Kan. Sept. 28, 2010) (requiring only disclosure of "material or principal facts supporting the contention" as "a contention interrogatory which seeks 'all facts' is overly broad and unduly burdensome on its face").  Kovzan contends that the Commission has not described in sufficient detail its evidence that each of the thousands of charges is an undisclosed perquisite, despite the fact that the Commission's response describes the evidentiary basis used to identify the relevant perquisites.  "As a general rule in this District, interrogatories seeking 'each and every fact' and which blanket the entire case are objectionable."  *Allianz Ins. Co. v. Surface Specialties, Inc*., 03-cv-2470 (CM/DJW), 2005 WL 44534, at *8 (D. Kan. Jan. 7, 2005). Consistent with this proposition, courts have at times ordered "a summary" of pertinent facts in recognition of the fact that "interrogatories should not seek a narrative of the opposing party's case."  *Shoemake v. McCormick, Summars & Talarico*, No. 10-cv-2514 (RDR/KGS), 2011 WL 5553652, at *7 (D. Kan. Nov. 15, 2011).  As courts in this District have long recognized, "[w]hatever may be said for the virtues of discovery and the liberality of the federal rules, which perhaps all courts recognize, there comes at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case."  *Hilt v. SFC Inc*., 170 F.R.D. 182, 186-87 (D. Kan. 1997); *IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998).

In *Hilt*, Magistrate Rushfelt found it objectionable that a plaintiff could be made, through the use of contention interrogatories, to provide "the equivalent of a narrative or otherwise detailed account of her entire case in chief, together with identification of virtually all supporting evidence for each fact." *Id*. Here, Kovzan *has already obtained* through his use of contention interrogatories what is essentially "a narrative or otherwise detailed account" of the Commission's case-in-chief. As set forth above, he has obtained a detailed articulation, along with citations to the Commission's evidence, that Fraser received undisclosed perquisites, and that Kovzan knowingly or recklessly concealed those payments. But he now seeks even more, asking the Court to require that the Commission set forth, for each of the literally thousands of individual perquisites, a detailed articulation "on an expense by expense basis" as to why each individual expense was a perquisite and why Kovzan should have known as much. Such a request is not appropriate where the principal facts and evidence pertinent to the inquiry of whether Kovzan fraudulently concealed the perquisites – and pertinent to the evidence that Kovzan must actually defend against at trial – is already known.

In *FTC v. Ivy Capital, Inc*., No. 11-cv-283 (JCM/GWF), 2012 WL 1883507, at *9 (D. Nev. May 22, 2012), the court explained that in an enforcement action where the government intended to prove a fraudulent scheme through "representative testimony and documents at trial to prove its claims that Defendants have engaged in a pattern or practice of misrepresentations [and] failures to disclose material facts," it would be "unduly burdensome" to interpret a contention interrogatory to require the government to "specifically answer [as to each misrepresentation or failure to disclose] with regard to each individual [defrauded] customer." *Id*. So too here. Where Kovzan has embarked upon a years-long pattern and practice of concealing Fraser's perquisite compensation, the Commission should not be made to undertake a

separate analysis of the thousands of individual expenditures permitted and concealed by Kovzan in furtherance of the scheme.

### 2. The Perquisite Information Supplied to Kovzan was Adequate at this Stage of the Action

Kovzan claims that the narrative information provided by the Commission does not permit him to ascertain the basis for the conclusion that particular expenditures are perquisites. But the expenditures all fall into the same, single category – expenditures paid to Fraser by the company that were not legitimate business expenses.  Kovzan knows that this, at bottom, is the basis for the Commission's view that *all* of these expenses were disclosable compensation to Fraser, which Kovzan concealed.  And notwithstanding Kovzan's smokescreen that he was somehow confused or lacked scienter due to his confusion as to what constitutes a "perquisite," it is a readily understandable and basic proposition of fact that where – as here – a senior executive authorizes the payment of personal expenses from the corporate till, those payments are disclosable compensation to that executive.  Courts have recognized as much even *before* the Commission first promulgated a definition of a "perquisite" for the first time in 1978.  *E.g., SEC v. Kalvex*, 425 F. Supp. 310, 312 (S.D.N.Y. 1975) (granting summary judgment for Commission based upon failure to disclose amounts that executive "siphoned off corporate funds from [company] for personal use by submitting expense vouchers and obtaining reimbursements therefor from [company] for expenses unrelated to any corporate purpose").

Kovzan objects to the Commission's purportedly "broad-brush" narrative describing its basis for identifying various expenses as personal on the claimed basis that the narrative "does not purport to be complete" in that with respect to credit card expenses that Fraser "marked with a 'P'" or "agreed to repay following NIC's various reviews of his expenses" there may be other bases for contending that certain items are personal. Mem. at 6. But again, Kovzan is entitled to

"principal or material" facts in response to contention interrogatory, and the fact that Fraser actually repaid the company hundreds of thousands of dollars for the expenditures is powerful evidence – and at least a "material" fact supporting the conclusion – that the expenditures were improper.  Similarly, the fact that Fraser personally identified various expenditures with a "P" is equally strong evidence of the nature of the expense – after all, in this context "P" does stand for "personal."

Kovzan also claims that the Commission's response is "unworkably vague and incomplete."  Mem. at 7.  He asserts that plaintiff does not identify which of the many expenses Fraser identified with a "P" it contends were not reimbursed.  *Id*.  But the Commission's response was not vague or incomplete.  In addition to its narrative description, the Commission identified the Bates numbers of Fraser's monthly credit card expense vouchers, which clearly show the expenses Fraser marked with a "P." Plaintiff's Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories at Response to Interrogatory No. 1(a)d.v.v., d.vi.lxx., d.vi.lxxi., d.vi.lxxii., d.vii.iv., d.vii.xlii., and d.vii.xliii.  The Commission asserts that all of Fraser's corporate credit card expenses (including those marked as "P" on Fraser's monthly expense vouchers) listed on SEC-P 0000001-056 are expenses that Fraser did not repay before the proxy statement was filed for the relevant reporting period.  Also among the documents identified by the Commission is Investigative Exhibit 72, which is a printout of an electronic spreadsheet that documents, in detail, approximately $76,000 in undisclosed personal expenses charged to a corporate credit card and paid by the company in 2004 and 2005, which Fraser did not repay until NIC conducted a second look back of Fraser's expenses in mid-2007.  Docket No. 65-1, ¶15.  Investigative Exhibit 55 documents a further $96,474 in undisclosed personal expenses (mostly corporate credit card expenses and some direct payments) that NIC

paid for Fraser between 2004 and 2006, and that Fraser did not repay until NIC's initial internal review concluded in early 2008.  Docket No. 65-1, ¶16.

The Commission's response also identifies "claimed out-of-pocket expenses" and "direct payments to third-parties" as categories of perquisites, and identifies documents that reflect these amounts.  Docket No. 65-1, ¶17.  The Commission identified an Excel spreadsheet produced by NIC (Bates numbered NIC141131) that demonstrates that in 2004 and 2005, NIC reimbursed Fraser a total of $22,500, in purported out-of-pocket expenses for "KC Housing," designating these expenses as "Possible Perks."  *Id*.  That same Excel spreadsheet identifies approximately $188,575 in direct payments on behalf of Fraser between 2004 and 2007, and concludes that $72,750 of these payments were "Possible Perks."  *Id*.  These out-of-pocket expenses and direct payments identified on the Excel spreadsheet as "possible perks" have not been repaid by Fraser or disclosed in NIC's filings with the Commission.  *Id*.

Kovzan finally complains that he cannot ascertain which of the perquisites fall under the category of "obviously personal expenses," but he has this information.  Kovzan omits any mention in his motion of the fact that the Commission has supplied even further detail with respect to its identification of specific perquisites expenditures (as well as information regarding his scienter) in response to *additional* contention interrogatories put forward by Kovzan.  Given the substantial overlap in the areas of inquiry of the interrogatories, such responses should be properly considered in determining the adequacy of the Commission's overall response.  *See SEC v. Berry*, No. 07-cv-4431 (RMW/HRL), 2011 WL 2441706, at *3 (N. D. Cal. June 15, 2011) (considering responses to overlapping interrogatories to determine adequacy of response).

Kovzan separately asked the Commission in Interrogatory 1 to his Third Set of Interrogatories to identify each of his false or misleading statements or omissions.  In response,

11

the Commission not only identified the specific misrepresentations and omissions in public filings that are the actual instruments of Kovzan's fraud against the company's shareholders in this case, the Commission further identified the $1.18 million Kovzan concealed in undisclosed perquisites.  The Commission disclosed that "[t]hese undisclosed perquisites to Fraser included, among other things: (i) over $4,000 per month to live in a ski lodge in Wyoming; (ii) monthly cash payments to Fraser for purported rent for a Kansas house owned by an entity Fraser set up and controlled; (iii) vacations for Fraser, his girlfriend and his family; (iv) Fraser's flight training, hunting, spa, skiing, and health club expenses; (v) computers and electronics for Fraser and his family; (vi) a leased Lexus SUV; (vii) costs for Fraser to commute by private aircraft from his home in Wyoming to his office at NIC's Kansas headquarters; and (viii) other daily living expenses such as groceries, liquor, tobacco, nutritional supplements, and clothing." Declaration of David Williams ("WD"), Ex. A.  In response to Kovzan's request to supplement this response, the Commission bolstered this response with *a specific identification of the evidence identifying and supporting every single one of these eight categories of perquisites*, specifically identifying to Kovzan the evidence pertaining to *all* of the perquisites at issue.  *Id.*

For instance, while Kovzan now argues that "plaintiff provides no information that would allow [him] to determine which expenses on the list supposedly relate to Mr. Fraser's then-girlfriend or which vendor expenses were spa treatments," Mem. at 7, this is simply not true. The Commission's response to Interrogatory 1 of Kovzan's Third Set of Interrogatories specifically identifies the evidence reflecting the particular expenditures:

> "Fraser's flight training, hunting, spa, skiing, and health club expenses [NIC170575;  NIC170601;  NIC170603;  NIC170608;  NIC170610;  NIC170615; NIC170623;  NIC170621;  NIC170630;  NIC170642;  NIC170660;  NIC170663; NIC170667;  NIC170681;  NIC004722;  NIC004724;  NIC004726;  NIC004651; NIC004714;  NIC004544;  NIC004554;  NIC004552;  NIC004560;  NIC004557; NIC004566;  NIC004569;  NIC004572;  NIC004570;  NIC004581;  NIC004580;

NIC004588;    NIC004585;    NIC004597;    NIC004608;    NIC004592;    NIC004609;
NIC004619;    NIC006012;    NIC006013;    NIC006011;    NIC006059;    NIC006063;
NIC005537;    NIC005682;    NIC004725;    NIC004544;    NIC004581;    NIC004580;
NIC004585;    NIC004599;    NIC004597;    NIC004609;    NIC004618;    NIC005424;
NIC004544;    NIC004581;    NIC004633;    NIC170594;    NIC170608;    NIC004641;
NIC004651;    NIC004652;    NIC004653;    NIC004658;    NIC004668;    NIC004672;
NIC004703;    NIC004632;    NIC004542;    NIC004544;    NIC004594;    NIC170540;
NIC170555;    NIC170564;    NIC170571;    NIC170581;    NIC170588;    NIC170594;
NIC170599;    NIC170608;    NIC170613;    NIC170615;    NIC170621;    NIC170628;
NIC170642;    NIC170651;    NIC170658;    NIC170667;    NIC170677;    NIC004641;
NIC004647;    NIC004643;    NIC004652;    NIC004653;    NIC004658;    NIC004668;
NIC004672;    NIC004676;    NIC004688;    NIC004694;    NIC004695;    NIC004699;
NIC004702;    NIC004704;    NIC004714;    NIC004720;    FIA-00065;    NIC004725;
NIC005553;    NIC004557;    NIC004564;    NIC004565;    NIC004597;    NIC004601;
NIC004610;    NIC004619;    NIC004628;    NIC004632;    NIC005424;    NIC005471;
NIC005540;    NIC005619;    NIC005692;    NIC005680;    NIC005820;    NIC005811;
NIC005901; NIC005908; NIC005970; NIC005973; 7-30-09 Fraser Inv. Test., 174:16-22,
175:4-176:2; 199:20-202:2; 5/19/09 Bur Tr. at 89:4-91:6; PWCLOT-0000444, 49, 55, 60,
66,                                    69,                       73,                       76;
http://www.sec.gov/Archives/edgar/data/1065332/000120677408000725/nic_nps.htm]
                    . . .
                    "vacations for Fraser, his girlfriend and his family [NIC004693; NIC170615;
NIC004564; NIC004566; NIC004593; NIC004564; 7-30-09 Fraser Inv. Test., 178:10-
179:7, 187:5-189:4; JF000047]"

*Id.*

The Commission has identified, in detail, the relevant expenditures in this case.  Kovzan

offers no credible reason to believe that the nature of the Commission's response hampers his

defense in any way.  Having initially come before the Court representing that Fraser's

"defalcations" were a "theft of property" which NIC "plainly never intended, as Mr. Fraser was

ultimately required to return what he misappropriated," Docket No. 14, p. 14, Kovzan now

baldly asserts that there will be "substantial evidence" that many of these very same expenditures

were "legitimate business expenses." Mem. at 8.  In support of his newly hatched theory, Kovzan

attempts to excuse the fact that Fraser submitted no documentation establishing the business

purpose of the expenditures, claiming that the Commission somehow "admits" that "a lack of

documentation alone is not a sufficient ground to render a business expense a perquisite."  *Id.*

But the Commission "admits" no such thing, as the absence of documentation is obviously a salient fact supporting the inference that the expenditures were personal – indeed, as Kovzan notes in his motion, "Fraser's expenses . . . covers well in excess of 2,000 specified expenses over a span of more than four and a half years, more than 1,200 of which are for amounts below $100." Mem. at 4.  The fact that Fraser could incur literally hundreds of thousands of dollars in, as Kovzan describes them "near trivial expenses," over a period of several years, *all without documentation*, creates a powerful inference that the expenses were, in fact, personal.  After all, "one reason for any such [documentation] requirement *is to ensure that the claimed expenses are proper and are not personal*."  *SEC v. Kovzan*, 807 F. Supp.2d 1024, 1040 (D. Kan. 2011) (emphasis supplied).

But more significantly, and consistent with the Order compelling the Commission's responses, the Commission has "narrowed the issues for trial" by identifying each of the expenses it asserts were personal.  Kovzan is perfectly free to endeavor to prove that the (heretofore defalcations) were legitimate business expenses.  Or focus on other facts in dispute.  Or both.  But he knows what expenses are at issue, and he knows what the Commission's proof on the personal nature of those expenses at trial will be.

### 3.  The Scienter Evidence Supplied to Kovzan is Adequate

Kovzan also contends that the Commission has not adequately described evidence demonstrating that he acted with scienter with respect to each of the undisclosed perquisites.  In response to his interrogatory, the Commission set forth in detail the facts evidencing his scienter. Kovzan further asked the Commission in Interrogatory 4 to his Third Set of Interrogatories whether the Commission asserted that in making his misrepresentations or omissions, he acted with scienter.  In response, the Commission supplied Kovzan with a further, more extensive, detailed narrative of his fraudulent conduct, the evidence supporting the fact of his scienter, as

14

well as *the evidentiary basis of every statement contained in paragraphs 23 through 47 of the Commission's Amended Complaint*.  These are the very facts – now documented with evidence – that the Court has previously concluded support the inference that Kovzan acted with scienter. *Kovzan*, 807 F. Supp.2d at 1039-40.  A substantially similar factual showing has survived summary judgment (and ultimately established liability as to scienter-based fraud claims at trial). *SEC v. Das*, No. 10-cv-102 (LSC), 2011 WL 4375787, at *8  (D. Neb. Sept. 20, 2011) (denying motion for summary judgment on elements of fraud claims, including scienter, as to CFO alleged to have concealed CEO's perquisite compensation).

While Kovzan argues in his motion that his "awareness of a miniscule fraction of the expenses" somehow undermines his knowledge and responsibility for other expenditures, *all* of the expenditures were incurred as a part of the same fraudulent scheme.  It bears emphasis that there is no dispute as to numerous significant facts: Kovzan *admits* that numerous expenditures were being paid by the company on Fraser's behalf and that he received spreadsheets containing listings of various expenses incurred by Fraser [Kovzan's Answer at 22, 24]; Kovzan *admits* that he was aware that Fraser did not submit documentation justifying the business nature of those expenditures [Kovzan's Answer at 22, 25, 26]; and he *admits* that he was aware of the requirement that compensation received by Fraser from the company was required to be disclosed [Kovzan's Answer at 20].  Kovzan's fraud does not turn on the specifics of any one expense or particular set of expenses, but on whether Kovzan knew or was reckless in not knowing that, as a general matter, NIC was paying undisclosed personal expenses for Fraser.

Kovzan also claims in his motion that "a detailed review of Mr. Fraser's monthly credit card charges and expense reports was not part of [his] duties."  Mem. at 12.  Kovzan does not mention that, as set forth in the Commission's response to Interrogatory 6 to his Third Set of

Interrogatories, the company's Assistant Controller – who reported directly to Kovzan – *was* responsible for the review of Fraser's charges, and as set forth in the Commission's response to Interrogatory 4 to his Third Set of Interrogatories, *repeatedly* warned Kovzan of problems with Fraser's expense reporting – including the warning to Kovzan in the earlier years of the scheme that "[a] number of these credit card and other expenses would completely [in]flame employees, our customers, the board, and investors if they were aware.  Hopefully, none of this is selected for audit and I won't have to explain the business purpose for these items."  Kovzan likewise omits any mention of the fact that, as noted in the Commission's response, in many instances Kovzan signed off on NIC's monthly corporate department financials, which listed expenses for Fraser that clearly appeared to be personal.  The personal expenditures nevertheless wound up being concealed in SEC disclosures *signed by Kovzan himself*.

And Kovzan's challenge to the Commission's response directed to his scienter is far less directed to the adequacy of the response than it is to litigating the question of his scienter on the merits.  For instance, relying largely upon his own self-serving testimony, Kovzan also claims that the Commission's interrogatory response does not adequately demonstrate his scienter with respect to his knowledge of recklessness of Fraser's commuting expense.  Mem. at 10.  But as also explained in response to Interrogatory 4 to his Third Set of Interrogatories:

> Kovzan knew that:  (i) Fraser resided in Wyoming and had a dedicated office at NIC's headquarters in Kansas; (ii) there was no business reason for Fraser to reside in Wyoming; and (iii) the personal benefits Fraser received -- private plane and other expenses to travel from his home to his office -- were not generally available to other NIC employees.  *Id*.; 1-6-10 Kovzan Inv. Test., 832:5-12; NIC007246; NIC114672

> In January 2004, NIC's Assistant Controller warned Kovzan that for tax purposes, there was a risk that Fraser's private plane travel from his Wyoming home to his Kansas office at NIC's headquarters could be deemed to be a commuting cost, which would be a personal expense and therefore compensation to Fraser.  NIC102804-05.  The Assistant Controller explained that he did not have sufficient information to determine Fraser's main place of work and they would need to perform an analysis of Fraser's business

activity for one year. *Id*. Kovzan, however, did not require this analysis be performed, and it never was done. 1-6-10 Kovzan Inv. Test.,754:13-755:3. Accordingly, Kovzan had no reasonable basis to treat Fraser's commuting cost as a business expense instead of compensation.

NIC's Board or its committees approved many of Fraser's travel and other expenses based on information that Kovzan and others in the finance department compiled. PWC-NIC-002113-135.

In March 2005, in connection with preparing the compensation disclosures for the 2004 proxy statement, NIC's Audit Committee Chairman, who also served as NIC's Compensation Committee Chairman (the "Committee Chairman"), expressed to Kovzan that Fraser's expenses for traveling between Wyoming and Kansas may not be deductible business expenses and may need to be disclosed as compensation to Fraser. AB001261-265. The Committee Chairman told Kovzan that he would defer to Kovzan on the issue as long as the required documents were being maintained. *Id*. Kovzan failed to inform the Committee Chairman that no analysis had been performed to support NIC's treatment of these travel expenses as business expenses and NIC was not retaining sufficient documentation. *Id*.

Again, these are the very facts that the Court has previously concluded support the inference that Kovzan acted with scienter in failing to disclose Fraser's commuting expense. *Kovzan*, 807 F. Supp.2d at 1039. The Commission respectfully submits that the facts evidencing Kovzan's scienter as to both commuting expenses as well as the other hidden perks which have been identified and evidenced in the Commission's responses, when evaluated in light of relevant judicial precedents (as shall be more fully explained in a later submission), not only create a question of fact as to Kovzan's scienter, *but establish his scienter as a matter of law*. Kovzan's motion is simply without merit.

### 4.   Kovzan Seeks Information Subject to Expert Discovery

The *actual evidence* that the Commission will offer at trial, should the matter proceed that far, and that Kovzan must defend against will consist of the spreadsheets and other documents already identified and produced to Kovzan which rather plainly evidence payments identified or repaid as perquisites. In addition, the Commission has supplied Kovzan what it has available to it, which is what the Commission views as the full universe of perquisites in this

case. But this is not evidence. After all, no amount of repetitive and burdensome discovery propounded by Kovzan upon the SEC can alter the inarguable proposition that once "the SEC has produced to the defendant the facts collected during that investigation," the parties are essentially on equal footing, as "*[n]o one at the SEC has any firsthand knowledge of the facts at issue in this case*." *SEC v. Buntrock*, No. 02-cv-2180, 2004 WL 1470278, at *3 (N.D. Ill. June 29, 2004). To the extent that the Commission chooses to offer further competent evidence of what perquisites, in fact, Fraser received, this evidence will be proffered through expert testimony.

To be sure, courts in this district do not permit a party to refuse to provide substantive responses to contention interrogatories simply because a party may later supplement the record with expert evidence. *E.g., In re Urethane Antitrust Litig.,* No. 04-md-1616 (JWL/JPO), 2009 WL 2058759, at *2 (D. Kan. July 15, 2009). These cases require that consistent with its obligations to answer the interrogatory "with whatever information they have," a party is required to respond with "the material or principal facts" which support its contentions. *Id.* The Commission has done so here, by identifying with specificity the perquisites that underlie the Commission's contention that Kovzan concealed Fraser's compensation.

But Kovzan, apparently unsatisfied with the Court-ordered discovery schedule in this case, asserts that if the Commission is not now able or willing to supplement its responses, it should be "barred from offering evidence on those subjects for those expenses on summary judgment and at trial." Mem. at 13-14. In essence, Kovzan now asks the court to preclude the submission of expert evidence and testimony *before such disclosure is even required* under the Court-ordered scheduling order. This Court has "authority to control the sequence of discovery to promote fair and just litigation practices" and may consistent with that authority enter an order

that includes "a requirement that discovery be had only at a specified time or only in a specified sequence." *Stoldt v. Centurion Industries, Inc*., No. 03-cv-2634 (CM/DJW), 2005 WL 375667, at *1 (D. Kan. Feb. 3, 2005).  Here, the Commission expects to put forward expert evidence which will consist of a detailed and comprehensive analysis of all of the perquisites at issue in this case.  Consistent with its authority, the Court should deny Kovzan's invitation to foreclose expert discovery before such discovery has even had the opportunity to take place. Where, as here, a contention interrogatory seeks premature disclosure of facts within the ken of a potential future expert, a motion to compel such responses is properly denied.  *Apsley v. Boeing Co*., No. 05-cv-1368 (MLB/KMH), 2007 WL 3120712, at *3 (D. Kan. Oct. 24, 2007).   This is particularly so where the clarification of what will ultimately be expert opinions may be better suited to expert depositions.  *See High Point SARL v. Spring Nextel Corp*., No. 09-cv-2269 (CM/DJW), 2011 WL 4526770, at *6 (D. Kan. Sept. 28, 2011) (clarification of factual basis for interrogatory response "can be done through depositions or other far less burdensome discovery devices")).

**<u>CONCLUSION</u>**

For the reasons stated above, the Court should deny Kovzan's Second Motion to Compel.

Dated:  November 28, 2012

Respectfully submitted,

  _/s/ Jeffrey S. Kruske_____
  Jeffrey S. Kruske (Kansas Bar No. 20098)
Office of the Securities Commissioner
109 SW 9th Street, Suite 600
Topeka, KS  66612
Telephone: (785) 296-5215

A. David Williams (Cal. Bar 183854)
David S. Mendel (D.C. Bar 470796)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5546
Phone: (202) 551-4548

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**


**<u>CERTIFICATE OF SERVICE</u>**


I hereby certify that on November 28, 2012, the foregoing Memorandum of Law in Opposition to Defendant Stephen M. Kovzan's Motion to Compel was filed with the Clerk of Court via the CM/ECF system, causing it to be served on Defendant's counsel of record.


 _/s/ Jeffrey S. Kruske_____
 Jeffrey S. Kruske (Kansas Bar No. 20098)
Office of the Securities Commissioner
109 SW 9th Street, Suite 600
Topeka, KS  66612
Telephone: (785) 296-5215